Argued July 11, 1973, affirmed August 8, 1974

ROACH, *Appellant, v.* KONONEN ET AL,
*Defendants,* and FORD MOTOR COMPANY,
*Respondent.*

525 P2d 125

*Donald Winfree,* Portland, argued the cause for appellant. With him on the briefs were Edwin J. Welsh, and Welsh, O'Donnell & Winfree, Portland; and James C. Walton, and Walton & Yokom, Pendleton.

*Roland F. Banks, Jr.,* Portland, argued the cause for respondent. With him on the brief were Ridgway K. Foley, Jr., and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL and BRYSON, Justices.

HOWELL, J.

This is an action for personal injuries sustained by plaintiff in an auto accident occurring on Highway 395 near the city of Pendleton. The action was tried

by the court without a jury, and a judgment entered for defendants. Plaintiff appeals.

At the time of the accident, plaintiff was driving northerly on Highway 395. Mrs. Gertrude Hinen was driving a 1965 Ford in a southerly direction when the hood on the Ford suddenly flew up, and the Hinen vehicle crossed the center line and collided with plaintiff's vehicle.

Just prior to the collision, Mrs. Hinen had stopped for gas and oil at a service station operated by the defendants Kononen in Pendleton. In servicing the car, the station attendant had opened and closed the hood.

Plaintiff filed this action against the defendants Kononen and the Ford Motor Company.[1] The trial court found in favor of both defendants. Plaintiff appeals only from the judgment in favor of Ford Motor Company and does not appeal from the judgment in favor of the defendants Kononen.

The plaintiff alleged, *inter alia,* that the Ford Motor Company negligently designed the latching mechanism for the hood, and, alternatively, that Ford should be strictly liable for such a defect in design. The issues of negligent design and strict liability for the latching mechanism of the hood were resolved against the plaintiff, and plaintiff does not appeal on any issue regarding the latching mechanism.

Additionally, plaintiff alleged that Ford was negligent in failing to design a hood that would provide "sufficient visibility for a driver to safely guide the

---

[1] Plaintiff executed a covenant not to sue in favor of Mrs. Hinen, and she was not a party to this action.

automobile should the hood fly up." Alternatively, the plaintiff also alleged that Ford was strictly liable for such a defect in the design of the hood. Whether plaintiff is entitled to prevail as a matter of law on either of these two theories is the issue presented in this appeal.[2]

In *Heaton v. Ford Motor Co.*, 248 Or 467, 435 P2d 806 (1967), we adopted Restatement (Second) of Torts, § 402A,[3] as providing a strict liability cause of action for persons injured by products which are in a defective condition unreasonably dangerous to a user or consumer. We also held that "unreasonable" means "dangerous to an extent beyond that which would be contemplated by the ordinary purchaser." Restatement (Second), supra, Comment *i*. Additionally, in *Askew v. Howard-Cooper Corp.*, 263 Or 184, 502 P2d 210 (1972), we applied Restatement (Second) Torts, § 402A and § 398,[4] which describes the duty of a manufacturer

[2] We note that the plaintiff may not be a user or consumer within the strict language of Restatement (Second) Torts, § 402A, but because of our disposition of the case it is not necessary to decide whether strict liability is extended beyond users and consumers of defective products.

[3] Section 402A provides:
"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

[4] Section 398, Restatement (Second) Torts, provides: "A manufacturer of a chattel made under a plan or design which makes

to design products in a non-negligent manner, to a design defect case.

However, plaintiff contends that, in the context of a defectively designed product, strict liability and negligence are essentially the same, and therefore traditional negligence concepts should be utilized in evaluating the defendant's conduct. *See Anderson v. Klix Chemical,* 256 Or 199, 472 P2d 806 (1970).

We note that legal scholars and courts have had substantial difficulty with the theories of negligence and strict liability in defective design cases. The difficulty carries over not only to matters of evidence and proof[5] but also to the instructions to the jury.[6]

Some courts have concluded that negligence and strict liability are essentially the same in a design defect case, and therefore only one cause of action arises from such a claim. Thus, in *Balido v. Improved Machinery, Inc.,* 29 Cal App 3d 633, 105 Cal Rptr 890 (1973), the California Court of Appeals for the Second District held that:

> "* * * Strict liability for deficient design of a product (as differentiated from defective manu-

---

it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."

[5] *See e.g.,* Phipps v. Air King Manufacturing, 263 Or 141, 501 P2d 790 (1972); Ault v. International Harvester Company, 10 Cal 3d 337, 110 Cal Rptr 369, 515 P2d 313 (1973); Sutkowski v. Universal Marion Corporation, 5 Ill App 3d 313, 281 NE2d 749 (1972); Rivera v. Rockford Machine & Tool Company, 1 Ill App 3d 641, 274 NE2d 828 (1971).

[6] *See e.g.,* Eshbach v. W. T. Grant's and Company, 481 F2d 940 (3d Cir 1973); Lunt v. Brady Manufacturing Corp., 13 Ariz App 305, 475 P2d 964 (1970).

facture or defective composition) is premised on a finding that the product was unreasonably dangerous for its intended use, and in turn, the unreasonableness of the danger must necessarily be derived from the state of the art at the time of design. (Thompson v. Package Machinery Co., 22 Cal. App. 3d 188, 191-92, 99 Cal. Rptr. 281) A danger is unreasonable when it is foreseeable, and the manufacturer's ability, actual, constructive, or potential, to forestall unreasonable danger is the measure of its duty in the design of its product. A manufacturer's failure to achieve its full potential in design and thereby forestall unreasonable danger forms the basis for its strict liability in tort. It is a liability whose essence parallels the lack of due care that is the essence of its liability for negligence. It may be seen, therefore, that in cases involving deficient design, foreseeability is merely scienter under another name. Since the issue is whether Improved [defendant] designed and put into circulation a product unreasonably dangerous for use and since the unreasonableness of the danger must be determined by the potential available to the designer at the time of design, it is apparent that the strict liability and negligence claims merge. * * *" 105 Cal Rptr at 895.

*Accord, Dorsey v. Yoder Company,* 331 F Supp 753, 760 (ED Pa 1971).

However, other courts have found error in instructions to the jury which confuse negligence with the consumer expectation test of strict liability. *Eshbach v. W. T. Grant's and Company,* 481 F2d 940 (3d Cir 1973); *Lunt v. Brady Manufacturing Corp.,* 13 Ariz App 305, 475 P2d 964 (1970). And the California Supreme Court has treated each concept differently in *Pike v. Frank G. Hough Company,* 2 Cal 3d 465, 85 Cal Rptr 629, 467 P2d 229 (1970). There, the test under Section 398 of Restatement (Second) of Torts

of reasonable care to make the product safe for its intended use was described as a "balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm." (Citing 2 Harper and James, The Law of Torts 1542, § 28.4 (1956).) The court went on to hold that § 402A is applicable to design defects as well as to manufacturing defects, and that the concept of dangerous to an extent beyond that which would be contemplated by the ordinary consumer in § 402A has equal applicability in either situation.[⑦] *See Cronin v. J.B.E. Olson Corp.,* 8 Cal 3d 121, 104 Cal Rptr 433, 501 P2d 1153 (1972).

The commentators also take somewhat divergent views on the subject. Dean Prosser, the reporter for the Restatement (Second), suggests that the consideration of a design defect "rests primarily upon a departure from proper standards of care, so that the tort is essentially a matter of negligence," and this involves a "duty to use reasonable care to design a product that is reasonably safe for its intended use, and for other uses which are foreseeably probable." Prosser, Law of Torts 641, 644-45, § 96 (4th ed 1971).

Professor Wade in his articles, *Strict Tort Liability of Manufacturers,* 19 Sw L J 5 (1965), and *On the Nature of Strict Tort Liability for Products,* 44 Miss L J 825 (1973), suggests that, at least in the context of an alleged defect in the design, a product can be defectively designed only if it is unreasonably dangerous. He posits the test that a manufacturer should be held strictly liable if the product is "not duly safe";

---

[⑦] *See also,* Bexiga v. Havir Manufacturing Corp., 60 NJ 402, 290 A2d 281 (1972).

or, stated in a test which looks to the manufacturer's conduct, the test would be, "assuming that the defendant had knowledge of the condition of the product, would he then have been acting unreasonably in placing it on the market?" This test is characterized as similar to negligence, except that the element of scienter is missing. Factors which should be considered by the court in balancing the utility of the risk against the magnitude of the risk are:

"(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

"(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

"(3) The availability of a substitute product which would meet the same need and not be as unsafe.

"(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

"(5) The user's ability to avoid danger by the exercise of care in the use of the product.

"(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

"(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance."

44 Miss L J at 837-38.

■ We agree that these factors should be considered by a court before submitting a design defect case to the jury. Also, proof of these factors bears on the

jury's determination of whether or not a given design is defective.

█ However, be all this as it may, it is generally recognized that the basic difference between negligence on the one hand and strict liability for a design defect on the other is that in strict liability we are talking about the condition (dangerousness) of an article which is designed in a particular way, while in negligence we are talking about the reasonableness of the manufacturer's actions in designing and selling the article as he did. The article can have a degree of dangerousness which the law of strict liability will not tolerate even though the actions of the designer were entirely reasonable in view of what he knew at the time he planned and sold the manufactured article. As Professor Wade points out, a way of determining whether the condition of the article is of the requisite degree of dangerousness to be defective (unreasonably dangerous; greater degree of danger than a consumer has a right to expect; not duly safe) is to assume that the manufacturer knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, something should have been done about the danger before it was sold. In other words, a greater burden is placed on the manufacturer than is the case in negligence because the law assumes he has knowledge of the article's dangerous propensity which he may not reasonably be expected to have, had he been charged with negligence.

In determining whether the evidence of dangerous defectiveness is sufficient to make a jury question, the court considers those tests previously set forth.

It is generally recognized that in the vast majority of cases, the application of either the theory of strict liability or of negligence seldom leads to dif-

ferent conclusions. *Cronin v. J.B.E. Olson Corp.,* supra, (501 P2d at 1162), citing Rheingold, *Proof of Defect in Product Liability Cases,* 38 Tenn L Rev 325, 326, n. 5 (1971); Keeton, *Products Liability—Some Observations About Allocation of Risks,* 64 Mich L Rev 1329, 1340-41 (1966); Wade, *Strict Tort Liability of Manufacturers,* 19 Sw L J at 15; Prosser, *The Assault Upon the Citadel,* 69 Yale L J 1099, 1119 (1960); Note, *Products Liability and Section 402A of the Restatement of Torts,* 55 Ga L J 286, 323 (1966); *contra,* Kessler, *Products Liability,* 76 Yale L J 887, 901 (1967). We find this to be particularly true when considering whether a product which is allegedly defectively designed is in a "defective condition unreasonably dangerous."

But, in any case, whether a court characterizes the cause of action as arising in negligence or strict liability, the proof of a defect which must be marshalled in support of the plaintiff's case usually takes the same form, and usually what proves one proves the other. Wade, supra, 44 Miss L J at 836-837. As the Court of Appeals for the Eighth Circuit held:

> "The comparative design with similar and competing machinery in the field, alternate designs and post accident modification of the machine, the frequency or infrequency of use of the same product with or without mishap, and the relative cost and feasibility in adopting other design [sic] are all relevant to proof of defective design." (Footnotes omitted.) *Hoppe v. Midwest Conveyor Company, Inc.,* 485 F2d 1196, 1202 (8th Cir 1973).

*See Phipps v. Air King Manufacturing,* 263 Or 141, fn. 1 at 143, 501 P2d 790 (1972).

With all this in mind we will examine the evidence to determine whether it required judgment for

plaintiff as a matter of law or whether it presented a fact question. In some areas the evidence was conflicting. The only evidence introduced by either party pertaining to negligence or strict liability was the following:

Plaintiff's expert witness, a research engineer, testified that because inadvertent hood openings could occur, precautions should be taken to protect the driver and the adjacent public, and these precautions should be included in the design of the vehicle. He suggested an alternative hood design which would allow visibility to the driver if the hood flew open, and further testified that he used that design to modify an automobile similar to Mrs. Hinen's. In that modified automobile, engine accessibility was unhampered and visibility was substantially increased. He also suggested that 1955-1965 Citroen and 1964 Dodge hood designs allowed adequate visibility under the hood, and that it was within the state of the art in 1965 to design a hood which allowed visibility for no additional cost.

Plaintiff also called a product quality engineer for Ford to testify on the issue of the hood design. He admitted that he was aware of only about six or seven inadvertent hood openings in a span of seven or eight years which had been reported to his department.

A principal design engineer for Ford testified that the proposed design alteration would require a reinforcement of the hood hinge area and the addition of a heavy beam across the hood to disperse the weight of the hood. These additions to the hood were estimated to cost between $5 and $10 per auto. He also testified that cars built after 1970 contained a hood design which allowed some visibility under the hood, but that there was no intent by the designers to meet the problem of visibility as this design change was a

result of a style change only. Finally, he testified that the principal purpose of designing a hood was to ensure that it would stay down, and the designers' efforts are directed at designing a latch which will keep the hood closed and thereby eliminate the problem of inadvertent hood openings.

As the evidence was conflicting, a question of fact was presented to the trial court. The judgment must, therefore, be affirmed.