Argued December 1, 1975, reversed and remanded January 22, petition for rehearing denied March 9, 1976

McMULLEN, *Appellant,*
*v.*
VOLKSWAGEN OF AMERICA et al, *Respondents.*

REYNOLDS, *Appellant,*
*v.*
VOLKSWAGEN OF AMERICA et al, *Respondents.*

BOUCHER, *Appellant,*
*v.*
VOLKSWAGEN OF AMERICA, *Respondents.*

545 P2d 117

*Bruce W. Williams,* Salem, argued the cause for appellants. With him on the briefs were Ralph C. Spooner, Daniel A. Ritter, Roy Harland, and Harland, Ritter & Haenny, Salem.

*Malcolm F. Marsh* of Clark, Marsh & Lindauer, Salem, argued the cause for respondent Volkswagen of America. With him on the brief were Michael C. McClinton, Salem, and Herzfeld & Rubin, P.C. and Michael Hoenig, New York, New York. Also on the

brief were Asa L. Lewelling, Salem, for respondent Eyerly Motors, Inc., and Jones, Lang, Klein, Wolf & Smith, Portland, for respondent Riviera Motors, Inc.

O'CONNELL, C. J.

## O'CONNELL, C. J.

Three actions for personal injuries as a result of an automobile collision have been consolidated for the purpose of this appeal. The trial court sustained defendants' demurrers to plaintiffs' complaints and plaintiffs appeal.[1] The facts are as follows:

Sometime prior to April 15, 1971, defendant Volkswagen of America sold a 1971 Volkswagen bus to defendant Riviera Motors, Inc., which in turn sold the same vehicle to Eyerly Motors, Inc. Eyerly Motors, Inc., supplied this vehicle to one of its employees, Frank Everett Reynolds, to use for business, pleasure and family purposes.

On April 15, 1971, the bus was involved in a collision with a 1968 Dodge automobile operated by Daniel M. Patzer. At the time Frank Reynolds was driving the Volkswagen, and Maria Reynolds and plaintiff Robert Boucher were passengers in the front and rear compartments respectively. As a result of the accident, Frank and Maria Reynolds suffered injuries resulting in their deaths. Robert Boucher suffered serious and permanent bodily injury.

. Separate actions were brought against Daniel M. Patzer by the personal representatives of the estates of Frank and Maria Reynolds and by Robert S. Boucher through his guardian ad litem. Following an out of court settlement, these three actions were dismissed.

Thereafter, plaintiffs' complaints were amended to include the respondents on this appeal. The complaints were brought on the theory of negligence, strict liability, and implied warranties of merchantability and fitness for a particular purpose. It was alleged that each defendant was liable for one or more of the following: designing, manufacturing, distributing or selling the Volkswagen bus in a defective condition. In *Reynolds v. Volkswagen, et al,* and *McMullen v. Volkswagen, et*

---

[1] None of the defendants are manufacturers. Volkswagen of America, Inc. is an importer; Riviera Motors, Inc. is a wholesale distributor, and Eyerly Motors, Inc. is a retail dealer.

*al,* it was alleged that the Volkswagen was defective in that the design, construction and materials of the front seat assembly and anchoring tracks allowed the post assembly to become disengaged from the anchoring tracks upon impact. The complaint in *Reynolds v. Volkswagen, et al,* also alleged that the design, construction and materials of the steering wheel and column prevented it from collapsing or giving away upon impact with a passenger. In *Boucher v. Volkswagen, et al,* it was alleged that the design, construction, and materials of the rear seat assembly and seat belt and rear door latching and locking device were defective in that they failed to keep occupants of the rear seat from being thrown from the vehicle. It was alleged that these defects enhanced plaintiffs' injuries as a result of the collision.

Defendants filed demurrers to plaintiffs' complaints upon the ground that in each instance they did not state facts sufficient to constitute a cause of action. The trial judge, in a letter opinion, refused to recognize a duty to manufacture, distribute and sell a "crashworthy" vehicle and sustained the demurrers.

Excellent briefs present to this court for the first time the question of whether the manufacturer or distributor is liable when a design defect does not cause the initial accident but merely enhances the plaintiff's injuries resulting from his collision inside the vehicle. Cases in which this occurs are sometimes referred to as the "second collision" cases.

Two divergent lines of authority have developed in this class of cases; some courts holding that the defendant has no duty to make his product "crashworthy"; others holding that there is such a duty. Some of the courts denying recovery to the injured plaintiff have done so on the ground that the defendant is liable only in those cases where the defect causes the *accident* and that he has no duty to design his product so as to minimize injuries where the accident arises from causes other than a defect in the product.

We are unable to accept this analysis. As one author has expressed it, "[t]here seems to be no rational basis for splitting the event of the collision and allowing recovery only where the condition of the automobile caused the accident; the accident and injury are all part of the same happening in which defendant's failure to use reasonable care caused harm."[2] Other reasons are advanced by defendants for denying recovery in the present case. It is argued that the enactment of both federal and state laws establishing regulatory agencies charged with the duty of establishing product design safety standards constitutes a legislative pre-emption of the power to fix such standards. Alternatively, it is urged that even if the fixing of design standards is not pre-empted by legislative action, the courts should defer to the legislative branch in this field because the legislative process provides a better method for the complexities of establishing such safety standards. As further support for this position, it is contended that fairness dictates that manufacturers should be able to determine prior to sale whether a design meets minimum standards and that this can be accomplished only by pre-established standards fixed by a legislative agency.

The arguments advanced by defendants are not without support in some of the adjudicated cases and in several of the periodicals.[3] In Henderson, Jr., *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication,* 73 Colum L Rev 1531, 1534 (1973), the author strongly presses the view that "courts are not suited to the task of establishing specific product safety standards in the course

---

[2] *Note,* 80 Harv L Rev 688, 689 (1967). The same criticism is equally applicable where recovery is sought on the basis of strict liability for injuries resulting from a defective product.

[3] *Evans v. General Motors Corporation,* 359 F2d 822 (7th Cir 1966), *cert. den.,* 385 US 835; *Schemel v. General Motors Corporation,* 384 F2d 802 (7th Cir 1967), *cert. den.,* 390 US 945 (1968); *McClung v. Ford Motor Company,* 333 F Supp 17 (S.D. W Va 1971), *aff'd.* 472 F2d 240 (4th Cir 1973); J. O'Connell, *Taming the Automobile,* 58 NW U L Rev 299, 375 (1963); Hoenig and Goetz, *A Rational Approach to "Crashworthy" Automobiles: The Need for Judicial Responsibility,* 6 SW U L Rev 1, 51 (1974).

of applying general reasonableness tests to determine the adequacy of allegedly defective products brought before them."[4]

The problem of determining whether in a particular case the design of a product meets the minimum standard of safety is without question very difficult and for that reason alone a court would understandably be tempted to unburden itself and the jury of the task of attempting to fix the standard. As tempting as this solution is, we are unable to find a basis for embracing it. There is nothing in the legislative history or in the text of either the federal or state product safety legislation indicating an intention to pre-empt the fixing of such standards. The federal statutes expressly provide that compliance with the standards fixed by the federal agency does not relieve a person from liability under common law.[5]

---

[4]Henderson sees the courts' efforts to fix design safety standards as "a very real threat to the integrity of the judicial process. Confronted with the hopeless difficulties of trying to redesign products via adjudication, and presumably unable to resist the social pressures generally favoring injured plaintiffs, courts would inevitably resort to some form of judicial coin-flipping, *i.e.,* they would begin to determine defendants' liability on some arbitrary basis rather than on the purported basis of the reasonableness of the product designs brought before them. Efforts to establish meaningful design standards would be abandoned in favor of allowing juries to determine defendants' liability upon no more substantial grounds than their own untutored 'good judgment,' or whim. The shift in the basis of manufacturers' liability would be disguised, consciously or otherwise, by heavy reliance upon unsupported opinions of experts relating to the ultimate issue of the reasonableness of defendants' conscious design choices. The absence of any viable product safety standards with which to decide these cases, however, would be obvious even to the casual observer. In effect, the adjudicative process would largely become a sham. Although such tactics might render these cases manageable in the short run, they would do so at the cost of a serious erosion of confidence in the courts by those litigants who would correctly come to realize that they have been denied effective access to the adjudicative process by such subterfuge." Henderson, at 1558.

[5]"Compliance with any Federal motor vehicle safety standard issued under this title does not exempt any person from any liability under common law." 15 U.S.C. § 1397 (2) (C) (Supp 1974), amending 15 U.S.C. § 1397 (2) (C) (1966).

The purpose of this section is explained in the report of the House Interstate and Commerce Committee: "It is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a

Although the Oregon statutes do not contain a provision comparable to 15 U.S.C. § 1397(2)(C), there is nothing to suggest that the Oregon Legislature intended to pre-empt the establishment of product safety standards so as to limit tort recovery to cases involving violations of the statutory standard. Defendants' argument that the courts should defer to the legislative branch of government because of the complexity of establishing design standards proves too much since it would disqualify the court and the jury from entertaining a large number of personal injury cases in which the determination of liability involves the treatment of factual determinations as complex and as "polycentric" as that required in the design cases.[6]

The difficulties which this and other courts have had in applying Section 402A of the Restatement of Torts[7] suggests that there may be good reasons for the courts to thoroughly reexamine the theory of strict liability in the products field.[8] But until this is done the design cases must stand or fall on the same basis and with the same treatment by the court and jury as other products cases.

Plaintiffs' second amended complaint stated facts sufficient to constitute causes of action against defen-

---

defense or otherwise to affect the rights of parties under common law particularly those relating to warranty; contract, and tort liability." H.R. Rep. No. 1776, 89 Cong., 2d Sess. 24 (1966).

See also, report of the Senate Committee of Commerce: "* * * Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law." S. Rep. No. 1301, 89th Cong., 2d Sess 12 (1966).

[6] As plaintiffs point out, the criteria adopted by us in Roach v. Kononen/Ford Motor Co., 269 Or 457, 525 P2d 125 (1974) will give some guidance to the court and jury in fixing the standard in products cases.

[7] For example, see *Markle v. Mulholland,* 265 Or 259, 509 P2d 529 (1973); *Redfield v. Mead, Johnson & Co.,* 266 Or 273, 512 P2d 776 (1973).

[8] Dickerson, *Was Prosser's Folly Also Traynor's? or Should the Judges Monument be Moved to a Firmer Site?,* 2 Hofstra L Rev 469 (1974).

dants, and therefore the demurrers to these complaints should have been overruled.

Reversed and remanded.