Argued and submitted November 23, 1994, affirmed May 10, 1995

Judy HOYT,
*Plaintiff,*

*v.*

VITEK, INC.,
a Texas corporation;
Novamed, Inc., a Texas corporation;
Charles A. Homsy and John N. Kent,
and E. I. du Pont de Nemours and Company,
a Delaware corporation,
*Defendants.*

(A8807-03720; CA A80213 (Control))

Lisa Kay MORSS
and Kenneth Morss,
*Appellants,*

*v.*

VITEK, INC.,
a Texas corporation;
Charles A. Homsy, and
Holladay Park Medical Center,
an Oregon corporation,
*Defendants,*

E. I. du PONT de NEMOURS & CO.,
a Delaware corporation,
*Respondent.*

(A8901-00022; CA A81272)

894 P2d 1225

Henry Kantor argued the cause for appellants Morss. With him on the briefs were Michael S. Morey and Kantor and Sacks.

Edward M. Mansfield, Phoenix, Arizona, and John R. Faust, Jr., argued the cause for respondent E. I. du Pont de Nemours & Co. With them on the briefs were Barry Fish, Bret A. Maidman and Lewis and Roca, Phoenix, Arizona, and Wayne Williamson, Mildred J. Carmack and Schwabe, Williamson & Wyatt.

Before Riggs, Presiding Judge,* and De Muniz and Leeson, Judges.

LEESON, J.

---

* Riggs, P. J., *vice* Rossman, P. J., retired.

## LEESON, J.

Plaintiff[1] brought this product liability action against E. I. du Pont de Nemours and Company (du Pont) for damages allegedly caused by the use of Teflon, which was manufactured and sold by du Pont, in a temporomandibular joint implant designed, manufactured and marketed by Vitek, Inc. (Vitek).[2] The trial court granted du Pont's motion for summary judgment on plaintiff's strict liability claim that Teflon is unreasonably dangerous because it was defectively designed and her claims of strict liability and negligence for failure to warn the medical community of risks associated with the use of Teflon in prosthetic implants in load-bearing human joints.

■ Plaintiff assigns error to the trial court's granting of that motion. We view the evidence and all reasonable inferences in the light most favorable to plaintiff, *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978), and, because du Pont is entitled to judgment as a matter of law, we affirm.

Most of the facts in this case are not disputed. After experiencing problems with her temporomandibular joints (TMJ) — the joint that connects the jaw bone to the skull — plaintiff underwent surgery in March 1986 to have implanted a prosthetic replacement known as the Proplast/Teflon TMJ Interpositional Implant or as the Proplast TMJ Implant. The implanted device gradually fragmented and released particles of Teflon,[3] which caused a giant cell foreign body reaction, resulting in the formation of granulomatous tissue and erosion of the surrounding bone. Plaintiff underwent additional

---

[1] Plaintiffs in this case are Lisa and Kenneth Morss. When we refer to plaintiff, we are referring to Lisa, who underwent implant surgery, and not to Kenneth, who brought a claim for loss of consortium. Plaintiffs' case was consolidated for appeal with an action brought by Judy Hoyt. The action brought by Hoyt was dismissed pursuant to an order signed April 26, 1995.

[2] Vitek is currently in bankruptcy, and is not a respondent in these proceedings. Other named defendants, Charles A. Homsy and Holladay Park Medical Center, are not parties to this appeal.

[3] Du Pont uses the trade name Teflon in the marketing of two types of perfluoropolymers: polytetrafluoroethylene (PTFE) and fluorinated ethylene-propylene (FEP). Both types were used in plaintiff's TMJ implant. Other manufacturers market the identical polymers under trade names that include Polyflon, Hostaflon, Fluon, Algoflon, Halon and Fluoroplast.

surgeries to remove the fractured implants and to reconstruct her jaw.

The TMJ implant that failed was designed, manufactured and sold by Vitek, a company founded by Dr. Charles Homsy in 1969. Homsy, a chemical engineer with a doctoral degree, was employed from 1959 to 1966 by du Pont, where he worked extensively with Teflon and related products. Homsy was interested in the biomedical uses of Teflon but was unable to interest du Pont in pursuing medical applications, because of du Pont's concerns about profitability and potential products liability. He subsequently accepted a position as director of the Prosthesis Research Laboratory at the Methodist Hospital in Houston, Texas, where he pursued the development of biocompatible Teflon applications.

Du Pont was aware that Homsy was investigating the possible use of Teflon in human joint implants while at Methodist Hospital. When Homsy ordered 60 pounds of PTFE resin in 1967, du Pont wrote to Methodist Hospital's purchasing agent and Homsy, stating:

> "Du Pont 'Teflon' is not made for medical use. While we carry out such tests as are needed to protect the ordinary users of our products, we do not perform the detailed longtime studies which should be made before those products are employed for purposes such as in medicine and surgery. Accordingly, we are reluctant to encourage the use of 'Teflon' for surgical purposes."

Du Pont's letter pointed out various studies that identified severe foreign body reactions to synthetic medical implants, especially results reported by Dr. Charnley in 1963 in a letter published in a British medical journal. Charnley had written:

> "Surgeons, and especially orthopedic surgeons, should be warned that tissue reactions are likely to follow implantation of polytetrafluoroethylene (P.T.F.E., 'Teflon', 'Fluon') if this material is subjected to abrasion, and that these reactions may not be manifest for two years." *The Lancet* 1379 (December 28, 1963).

Du Pont required Methodist Hospital to accept the following precondition to sale:

> "Since we have no knowledge of the suitability of 'Teflon' for your medical use, and since the contemplated use is one that you propose and has not been recommended by us, it must be

understood that you are relying upon your own medical judgment as to its safety and effectiveness. Therefore, *we will provide* you with \* \* \* 'Teflon' \* \* \* *only on the understanding that you assume full responsibility for any consequences which may result directly or indirectly from its use.*" (Emphasis supplied.)

Homsy responded by letter that he understood du Pont's need to "require disclaimers from medical users," but disputed the cautionary studies cited by du Pont. According to Homsy, those studies were based on an "incomplete understanding of polymer application" and had "produced a literature which unfairly indicts TFE polymer." He ascribed Charnley's research results to the use of *pure* PTFE for hip protheses. Homsy expressed his intention to engage Charnley in discussion and eventually "to place the medical application of this remarkable material on an unambiguous basis."

Du Pont was aware of other studies that questioned the safety of Teflon implants, such as a 1965 study by Leidholt and Gorman that concluded that Teflon hip joints were unsafe when implanted in dogs. However, du Pont was also aware that such studies were not directly applicable to the evaluation of TMJ implants, because the hip joint bears significantly more weight and because those studies concluded that the lack of success with pure Teflon did not foreclose the possibility of better results from Teflon modified by impregnation with other substances.

Homsy's research into modified Teflon materials led to the invention of Proplast, a porous spongy biomaterial that encourages human tissue ingrowth. Proplast is made by mixing PTFE fiber and resin with either carbon or aluminum oxide and salt and subjecting the mixture to a multi-step manufacturing process of filtering, compressing, rolling, drying, high temperature sintering, leaching and redrying. Although the PTFE remains unchanged chemically, Proplast has very different physical characteristics than pure PTFE. Short of chemical analysis, the two substances appear quite different. Homsy patented both Proplast and the manufacturing process. In 1969, he formed Vitek to manufacture and market Proplast implants.

Extensive studies of Proplast by Vitek researchers demonstrated its apparent reliability. Those studies included

a five-year evaluation of implants performed at 12 hospitals, involving about 900 patients. In 1974, Vitek began selling Proplast implant materials commercially in various forms, including blocks, coatings on metal implants and sheets. One form of sheeting, developed by Dr. Kent, a consultant to Vitek and chair of the Oral and Maxillofacial Surgery Department at Louisiana State University, was a lamination of Proplast and FEP film formed by fusing the two substances. Kent's clinical studies and Vitek's load-bearing tests suggested the suitability of the laminated material for TMJ implants.

In May 1977, after passage of the Medical Device Amendments of 1976 (MDA) to the Food, Drug and Cosmetics Act, 21 USC § 301 *et seq*, du Pont again wrote to Vitek to reiterate its concerns about medical uses of Teflon. As Vitek's president, Homsy agreed to comply with all federal Food and Drug Administration (FDA) regulations and signed du Pont's disclaimer as a precondition to purchase:

> "Du Pont Teflon® fluorocarbon resins * * * are made for industrial purposes only. We conduct such tests as are needed to protect the ordinary users of these products but do not perform the detailed, long-term studies which should be made before they are used for medical or surgical purposes. We make no medical or surgical grades and have not sought or received any rulings from the Federal Food and Drug Administration or from any governmental agency as to the safety or effectiveness of these products for such purposes.

> "Persons proposing to evaluate or to use these products for medical or surgical purposes must rely on their own medical and legal judgment without any representation on our part. They must accept full responsibility for all consequences, either direct or indirect."

Under the statutory scheme of the MDA, the FDA classified Proplast implant material (identified as PTFE with carbon fibers composite implant material) under "Class II." 21 CFR § 878.3500. That classification permits a device to be marketed under the "general controls" applicable to all devices — including registration, labeling, good manufacturing practices and compliance with misbranding provisions — until the FDA establishes specific performance standards for that device. *See* 21 USC § 360c, d. The FDA noted that it was accepting the recommendations of two panels of experts who believed that "the safety and effectiveness of the material has

been established through long-term clinical trials," after reviewing clinical data presented by Homsy and Kent. 47 Fed Reg 2818 (1982).

The type of Proplast TMJ implant at issue in this case was developed in 1982. It was composed of the same laminated Proplast/FEP sheeting already available, but in pieces preshaped to match the natural geometry of the articulating surfaces of the TMJ, with the slippery FEP film positioned on the articulating side of the implant to act as a disc (meniscus) replacement. This development was significant, because most TMJ problems are related to displacement or deterioration of the meniscus, which serves as a lubricating cushion between the condyle (upper end of the mandible) and the temporal fossa (the notch in the skull into which the condyle fits). Vitek applied to the FDA and was granted permission to market the device under the same "general controls provisions" that had applied to the previously classified laminated sheeting "until such time as [the] device has been classified" and standards specific to the device were issued.[4] Although the FDA cautioned that permission to market the preshaped implant "should not be construed as approval of your device or its labeling," its permission was granted under 21 USC section 360k, which allows the FDA to place a new device into the same classification as a "substantially equivalent" device marketed before enactment of the MDA. Accordingly, in 1983 Vitek began to sell the TMJ implants with instructions about surgical and sterilization techniques and warnings about risks of infection. However, the instructions did not warn about the dangers associated with fragmentation and immune system reactions to abraded particles of Teflon.

In 1984, du Pont's Central Research and Development Department undertook a market research project to evaluate the potential for soft tissue prostheses as a part of a larger orthopedics development program. Consequently, Bernhardt, a du Pont employee, began investigating TMJ disorders and their correction. He conducted a literature search, established contacts with two experienced clinicians, and attended a conference of the American Association of

---

[4] The FDA did not adopt specific standards for the Proplast/FEP sheeting or the Proplast TMJ Implant before plaintiff's implant surgery.

Oral and Maxillofacial Surgeons (AAOMS). Bernhardt prepared a "Memo to File" summarizing the views presented by medical experts at that conference. A commonly expressed theme was that "TMJ meniscectomy is not a simple procedure" and that "one of the problems is how to attach prostheses."

In 1985, du Pont and Vitek explored the "prospect of a symbiotic relationship." However, in early 1986, du Pont decided against pursuing "any joint venture, equity position or other relationship with Vitek." Du Pont's Development Division made that recommendation because it concluded that a relationship with Vitek would not strengthen du Pont's market position as much as other potential collaborative opportunities. Additionally, du Pont's technical experts had raised "concerns about the clinical efficacy of Proplast devices in orthopedic hard tissue applications." They concluded that the marketing of Vitek's technology "may be appropriate for a small firm like Vitek but might result in too great a liability exposure for a large 'deeper pocket' company like Du Pont." Despite Vitek's use of the trade name Teflon as part of its Proplast/Teflon TMJ Interpositional Implant, there is no evidence that the relationship between du Pont and Vitek was anything other than that of a supplier of raw materials to a manufacturer of a finished product.

It is undisputed that plaintiff suffered serious physical harm because of the failure of the Proplast/Teflon device that was surgically implanted in her jaw. The overarching question on appeal is whether, as a matter of law, plaintiff is foreclosed from holding du Pont liable for her injuries.[5]

---

[5] More than 30 other courts have granted judgment to du Pont as a matter of law on virtually identical claims involving other plaintiffs who received Vitek TMJ implants, including several United States Circuit Courts of Appeal. *See Anguiano v. E.I. Du Pont De Nemours & Co. Inc.*, 44 F3d 806 (9th Cir 1995); *Apperson v. E.I. du Pont de Nemours & Co.*, 41 F3d 1103 (7th Cir 1994); *LaMontagne v. E.I. Du Pont de Nemours & Co., Inc.*, 41 F3d 846 (2nd Cir 1994); *Rynders v. E.I. Du Pont, De Nemours & Co.*, 21 F3d 835 (8th Cir 1994); *Klem v. E.I. Du Pont De Nemours Co.*, 19 F3d 997 (5th Cir 1994). Although those cases are instructive, they entail state law claims in jurisdictions other than Oregon. Of greater import are two federal court cases that involved Oregon plaintiffs and federal interpretation of Oregon law in which du Pont was granted summary judgment. *See In re: TMJ Implants Products Liability Litigation* JPML (94-MD-1001 D Minn 1995) (280 cases consolidated and assigned to Minnesota district court by the Judicial Panel on Multidistrict Litigation, including 10 originally filed in the District of Oregon, involving 26 Oregon plaintiffs and Oregon tort law); *Seifert v. Vitek, Inc. et al.*, (91-479-JE D Or 1993).

■     As a threshold matter, we address du Pont's argument that the MDA expressly preempts plaintiff's state law claims. The MDA provides that:

"no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement —

"(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

"(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." 21 USC § 360k(a).

However, pursuant to 21 USC section 371(a), which authorizes the FDA to issue regulations, the FDA has established that the MDA preempts state law that is "different from, or in addition to, any requirement applicable to such device under any provision of the act." 21 CFR § 808.1(b). Because identification and classification provisions do not "relate to the safety or effectiveness of the device," 21 USC § 360k(a)(2), the FDA itself has interpreted the preemptive scope of the MDA to require preemption only where the FDA has issued regulations and requirements specific to a medical device beyond mere identification and classification. *Anguiano v. E.I. Du Pont De Nemours & Co. Inc.*, 44 F3d 806, 809-10 (9th Cir 1995); *LaMontagne v. E.I. Du Pont de Nemours & Co., Inc.*, 41 F3d 846, 853 (2nd Cir 1994). At the time of plaintiff's implant, the FDA had only classified Proplast under "Class II" without specific performance standards, 21 CFR § 878.3500, and had subjected Proplast TMJ Implants to the same "general controls." Therefore, we agree with the Ninth and Second Circuits that plaintiff's state law claims are not preempted by the MDA.

     Turning to the merits, we first consider the arguments raised by plaintiff's strict liability claims. She claims that Teflon is an unreasonably dangerous product because it is defectively designed, and that it is unreasonably dangerous because of du Pont's failure to warn her or the medical community of its inherently dangerous propensity to shed tiny splinter-like fragments when abraded.

ORS 30.920 governs strict liability of the seller of a product.[6] With only minor changes, that statute codifies *Restatement (Second) Torts* § 402A (1965). It is to be construed "in accordance with * * * sec. 402A, Comments a to m (1965)." ORS 30.920(3). However, section 402A has been applied in strict liability cases since its adoption by *Heaton v. Ford Motor Co.*, 248 Or 467, 470, 435 P2d 806 (1967), well before its codification in ORS 30.920. *Harris v. Northwest Natural Gas Company*, 284 Or 571, 576, 588 P2d 18 (1978).

■    Liability for unreasonably dangerous defective products normally arises either from manufacturing defects or design defects (including failure to warn). *Phillips v. Kimwood Machine Co.*, 269 Or 485, 491 & n 2, 525 P2d 1033 (1974). Plaintiff does not allege that any of the Teflon used in her TMJ implant was defectively manufactured. Rather, her claims focus on design defect and failure to warn.

■■    Whether a product is defectively designed because it is unreasonably dangerous for some applications is a question first for the court to consider by balancing the product's utility against the magnitude of the risk associated with its use. *Roach v. Kononen/Ford Motor Co.*, 269 Or 457, 464, 525 P2d 125 (1974). Where the utility of the product is great and any change of design necessary to alleviate the risk would adversely affect its utility, such a product is not defectively designed even though the possibility of injury was realized at the time of sale. *Phillips*, 269 Or at 495.

---

[6] ORS 30.920 provides, in part:

"(1) One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition if:

"(a) The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

"(2) The rule stated in subsection (1) of this section shall apply, even though:

"(a) The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

"(b) The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor."

■      It is indisputable that Teflon is safe for a wide variety of uses. Because of its unique characteristics, such as chemical inertness, heat resistance, electrical insulation and slippery surface, Teflon has been effectively used in diverse industrial and commercial applications (including nonstick frying pans, engine parts, pipe linings, solar collectors, space shuttle nose cones and waterproof fabric coatings), and in medical applications (including artificial human veins, sutures, middle ear drain tubes, and maxillofacial reconstructive surgery). Those physical characteristics are attributable to its molecular structure. As the trial court stated, "if it were designed differently it wouldn't be the Teflon product or either of the two Teflon products involved here, it would be something else." In short, if Teflon were designed differently, it would not have the properties that make it useful in so many applications. As sold by du Pont, Teflon is not an inherently dangerous, defectively designed product. As a matter of law, the trial court did not err in dismissing plaintiff's design defect claim.

■      Plaintiff next claims that du Pont is strictly liable for failure to warn her and the medical community of the dangers of using TMJ implants made with Teflon. Although "[a] product is not in a defective condition when it is safe for normal handling and consumption," if the seller

> "has reason to anticipate that danger may result from a particular use, * * * [the seller] may be required to give adequate warning of the danger (*see Comment j*), and a product sold without such warning is in a defective condition." *Restatement (Second) Torts* § 402A, *comment h* at 351-52. (Emphasis supplied.)

At issue is whether du Pont had a duty to warn, and if so, whether its warning to Vitek was adequate.

      Section 402A, *comment j*, requires that the seller give warning if the seller "has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge," of the danger. *Comment j* specifically addresses warnings that the seller of a product must make about the ingredients it contains. Section 402A contains the caveat that its rules are not meant to apply "to the seller of a component part of a product to be assembled." Because Teflon is a component part of Vitek's TMJ Implant,

the general rules outlined in section 402A regarding warnings are inapposite.

Section 402A, *comment p*, although outside the range of the comments made mandatory by ORS 30.920(3), provides an example that illustrates the relevant principle:

> "[T]he manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. No doubt there will be some situations, and some defects, as to which the responsibility will be shifted, and others in which it will not."

The facts in *Harris* provide the closest analogy in Oregon law to the pigiron example in section 402A, *comment p*. In that case, the plaintiff, who was injured when natural gas combusting in the pilot light of his water heater ignited gasoline vapors in his garage, alleged that the defendant gas company was strictly liable because the defendant's product (natural gas as it was ignited in the pilot light) was defective and because the defendant failed to warn the plaintiff that its product was dangerous. The Supreme Court rejected that argument. It reasoned that natural gas was not defective for most uses, but became so only when used in certain appliances and exposed to volatile vapors. It concluded that the "alleged design defect * * * exists if at all with the hot water heater and furnace, not with the gas and flame." *Harris*, 284 Or at 577. With regard to strict liability for failure to warn, the court found the relationship between the natural gas that the defendant sold and the situation in which it may have become unreasonably dangerous "too attenuated and remote" to be within the "limits of applicability of strict liability which this court will recognize." *Id.*[7]

---

[7] The court rejected the plaintiff's reliance on two other failure to warn cases. *Brizendine v. Visador Company*, 305 F Supp 157 (D Or 1969), *aff'd in part* 437 F2d 822 (9th Cir 1970), was distinguished in part because the defendant-manufacturer's product — glass used in a door light and sold by a distributor — was unsafe for a majority of uses. Plaintiffs here also attempt to rely on *Brizendine*, but that reliance is misplaced in the light of the many safe uses to which Teflon is put. *Fullbright v. Klamath Gas Co.*, 271 Or 449, 553 P2d 316 (1975), involved a situation in which the defendant-seller of propane gas controlled the distribution of the gas *and* the

The parallels between *Harris* and this case are obvious. Here, plaintiff alleges that Teflon is defectively designed. Like the gas in *Harris*, however, Teflon is not in and of itself defective. It only became so when used by Vitek in the manufacture of devices sold to be implanted in plaintiff's jaw. There is no evidence that du Pont had any influence or control over Vitek's design decision to incorporate Teflon into its devices. A similar parallel exists regarding du Pont's duty to warn. The relationship between the Teflon that du Pont sold and the use in which it became unreasonably dangerous is at least as attenuated and remote as that described in *Harris*. Although plaintiff argues that du Pont knew that Vitek intended to use Teflon in its medical devices, the gas supplier in *Harris* also knew its product would be used in water heaters. Moreover, du Pont informed Homsy and Vitek in writing in 1967 and again in 1977 that du Pont did not know whether Teflon was safe for medical uses.

As persuasive as we find *Harris*, it is arguably distinguishable from this case because of factual differences. Nevertheless, du Pont contends that *Harris* provides support for adoption of the so-called "raw material supplier" doctrine. Several courts have released du Pont from strict liability as a matter of law by applying that doctrine. *See In re: TMJ Implants Products Liability Litigation*, JPML (94-MD-1001 D Minn 1995); *Apperson v. E.I. du Pont De Nemours & Co.*, 41 F3d 1103 (7th Cir 1994); *Rynders v. E.I. Du Pont, de Nemours & Co.*, 21 F3d 835 (8th Cir 1994); *Kealoha v. E.I. Du Pont De Nemours & Co.*, 844 F Supp 590 (D Haw 1994); *Bond v. E.I. Du Pont De Nemours and Co.*, 868 P2d 1114 (Colo App 1993). Two of the cases that were persuasive to those courts, and that are also cited by the parties to this appeal, are most instructive.

In *Crossfield v. Quality Control Equipment Co., Inc.*, 1 F3d 701 (8th Cir 1993), the plaintiff was injured by a chain supplied by the defendant and incorporated into another manufacturer's "chitlin" cleaning machine. The court dismissed as a matter of law the plaintiff's claim of strict liability

---

distribution of the tanks and the burner that, in combination with the defendant's failure to warn, caused the plaintiff's injury. That case is also inapposite here.

against the supplier for failure to warn.[8] In doing so, it applied the principle that the supplier of a component part that is not inherently defective cannot be held strictly liable for failure to warn of dangers that might arise if the part is integrated into a machine that the supplier played no part in building. *Id.* at 703, 705. The court reasoned:

"To impose responsibility on the supplier of the chain in the context of the larger defectively designed machine system would simply extend liability too far. This would mean that suppliers would be required to hire machine design experts to scrutinize machine systems that the supplier had no role in developing. Suppliers would be forced to provide modifications and attach warnings on machines they never designed nor manufactured. Mere suppliers cannot be expected to guarantee the safety of other manufacturer's machinery." *Id.* at 704.

In *Childress v. Gresen Mfg. Co.*, 888 F2d 45 (6th Cir 1989), a nondefective hydraulic valve supplied by the defendant and incorporated into a log-splitter by another manufacturer resulted in serious injury to the ultimate user. The court held that, as a matter of law, strict liability cannot be extended to the supplier of a component part that was misapplied rather than defectively designed. *Childress* makes clear that even if the supplier has knowledge that the final design of the completed product might make the use of the component dangerous, the supplier cannot be held responsible for the safety of the final product. A contrary policy

"would encourage ignorance on the part of component part manufacturers or alternatively require them to 'retain an expert in the client's field of business to determine whether the client intends to develop a safe product' * * * [and] would be tantamount to charging the component part manufacturer with knowledge that is superior to that of the completed product manufacturer." *Id.* at 49.

We find the reasoning in *Crossfield* and *Childress* compelling and directly applicable to the facts in this case. Teflon is a multi-use raw material that is not inherently defective. It became unreasonably dangerous only when incorporated as a component in Vitek's TMJ implant. Even if

---

[8] The *Crossfield* court simultaneously dismissed a claim for negligent failure to warn. Because of Oregon's unique formulation of negligence law, we address plaintiff's negligence claim separately.

du Pont was aware that the use of Teflon in the final design of Vitek's products might be dangerous, there is no evidence that du Pont influenced, controlled or was otherwise responsible for Vitek's design decisions. To the contrary, du Pont cautioned Vitek about possible dangers and warned that "contemplated use is one that you propose and has not been recommended by us."

This case presents, apparently for the first time in Oregon, the question of whether strict liability should be extended to the supplier of a component part that was misapplied rather than defectively designed. Application of strict products liability requires limitations to avoid imposition of absolute liability whenever use of a product results in injury. *Phillips*, 269 Or at 491. The Supreme Court's decision in *Harris* supports our conclusion that the "raw material supplier" doctrine, as expressed in *Crossfield* and *Childress*, applies in this case. Accordingly, we hold that du Pont, as the supplier of Teflon, is not strictly liable for failure to warn plaintiff or the medical community of the danger that resulted from Vitek's use of Teflon in its TMJ implants. With respect to strict liability failure to warn, therefore, the trial court did not err in granting du Pont's motion for summary judgment.

Plaintiff stresses that many court decisions, including the trial court's summary judgment, have erred by treating Teflon PTFE and FEP the same when they are not. She contends that plaintiff's "FEP claims are entitled to and must receive separate consideration." We acknowledge that PTFE and FEP are chemically distinct substances and that the FEP film used in Vitek's implants was merely laminated to Proplast without further processing. Nevertheless, that difference is pertinent only to the issue of whether Teflon underwent a "substantial change in [its] condition" before reaching the consumer. ORS 30.920(1)(b). Because we hold that du Pont is not strictly liable under the "raw material supplier" doctrine, we need not address whether Teflon PTFE or FEP underwent a "substantial change."[9]

---

[9] We also need not address whether du Pont's liability for failure to warn plaintiff or the medical community is foreclosed because its duty to warn ended when it warned Vitek, a sophisticated final products manufacturer. *See Restatement (Second) Torts* § 388, *comment n* (1965).

■    Finally, we consider plaintiff's claim that du Pont was negligent in failing to warn her or the medical community of the dangers of using Teflon in TMJ implants. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), states Oregon's unique negligence formulation: liability for harm resulting from a defendant's conduct turns on "whether that conduct unreasonably created a foreseeable risk to the protected interest of the kind of harm that befell the plaintiff," unless some special status, relationship or specific standard defines the defendant's duty. In *Wood v. Ford Motor Co.*, 71 Or App 87, 90, 691 P2d 495 (1984), *rev den* 298 Or 773 (1985), we examined the law related to the status of a supplier of products, and relied on section 388 of *Restatement (Second) Torts* to declare that a seller is "negligent if it fails to warn of those dangerous propensities of which it knows or reasonably should know."[10] *See also McEwen v. Ortho Pharmaceutical*, 270 Or 375, 389, 528 P2d 522 (1974); *Barry v. Don Hall Laboratories*, 56 Or App 518, 524, 624 P2d 685 (1982).

    Plaintiff argues that "Du Pont knew or should have known that Teflon was unreasonably dangerous for use in TMJ implants * * * [and] failed to warn doctors and patients of the risks." She relies on the inferences that can be drawn from du Pont's knowledge of the Charnley study and the Leidholt and Gorman study; information gathered by Bernhardt during his exploration of a possible soft-tissue prosthesis project by du Pont in 1984; and experts' recommendations to du Pont that influenced its decision to abandon a possible joint venture with Vitek in 1986. Du Pont denies both "significant expertise concerning *medical* (as

---

[10] *Restatement (Second) Torts* § 388 (1965) states:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a) *knows or has reason to know that the chattel is or is likely to be dangerous* for the use for which it is supplied, and

"(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (Emphasis supplied.)

opposed to industrial) uses of Teflon" and knowledge of the failure of Vitek's implants.

The studies that du Pont referred to in its 1967 disclaimer to Homsy showed only that du Pont was aware of the reported dangers of using *pure* PTFE in *hip* replacements. Homsy's response questioned the relevance of those studies because he intended to use *modified* polymer materials in *jaw* implants. Du Pont was also aware of other suggestions in the scientific literature that the earlier studies might not apply to the use of modified Teflon materials, or to implants that would not be subjected to the level of load-bearing forces found in the hip. There is no evidence showing that du Pont knew that the TMJ is a load-bearing joint posing the same risks as those encountered in the hip joint. In 1982, two of the FDA's expert panels concluded that "the safety and effectiveness of [Proplast] has been established through long-term clinical trials" and the FDA agreed to accept Proplast components "as safe materials for human implantation." In 1983, the FDA granted Vitek permission to market the Proplast TMJ Implant. The 1984 Bernhardt memorandum summarizes what he heard from speakers at the AAOMS conference about modified Teflon materials. That memo gives no indication that any of the conference speakers spoke specifically about Vitek's TMJ implant. There was no basis for du Pont to conclude that Vitek's TMJ implant or Proplast is dangerous from those comments. In any event, there is no indication that Bernhardt's memorandum was circulated to others at du Pont or that it indicated even Bernhardt's understanding of significant risks. Finally, expert advice to du Pont in 1986, which expressed "concerns about the clinical efficacy of Proplast devices," was specifically given in reference to "orthopedic hard tissue applications" that use Proplast as a coating in orthopedic prostheses rather than for soft tissue replacement following TMJ meniscectomy. Even then, du Pont's experts noted that data regarding failure rates of Proplast coated devices are "open to different interpretations," and, like the 1984 conference speakers, indicated that poor surgical technique could account for the failures of Proplast prostheses.

In sum, nothing in the evidence presented by plaintiff would permit a reasonable factfinder to infer that du Pont

knew or reasonably should have known of the hazards of the Vitek implant. Without that knowledge, du Pont had no duty to warn. *Buchler v. Oregon Corrections Div.*, 316 Or 499, 509, 853 P2d 798 (1993). Therefore, the trial court did not err in granting summary judgment for du Pont on the claim of negligent failure to warn.

Affirmed.