Argued and submitted July 10, reversed and remanded in part; otherwise affirmed October 25, appellant's motion for reconsideration filed November 17, 1995, allowed by opinion January 3, 1996
See 138 Or App 476, 909 P2d 212 (1996)

Janice M. MEARS,
*Appellant,*

*v.*

William R. MARSHALL, M.D.,
and Collagen Corporation,
*Respondents.*

(9307-04839; CA A85078)

905 P2d 1154

Susan A. Allinger, Houston, Texas, argued the cause for appellant. On the opening brief were Michael M. Essmyer, Essmyer & Tritico, L.L.P., Houston, Texas, and Clinard J. Hanby, The Woodlands, Texas, and Jeffrey S. Merrick and Williams & Troutwine, P.C. On the reply briefs were Michael M. Essmyer, Essmyer & Tritico, L.L.P., Houston, Texas, and Clinard J. Hanby, The Woodlands, Texas.

Janet Schroer argued the cause for respondent William R. Marshall, M.D. With her on the brief were Gordon J. Evans and Hoffman, Hart & Wagner.

Joe W. Redden, Jr., argued the cause for respondent Collagen Corporation. With him on the brief were Curt Webb and Beck, Redden & Secrest, and Eric J. Neiman, John D. Ostrander and Tooze Shenker Duden Creamer Frank & Hutchinson.

Alfredo Wheelock filed an *amicus curiae* brief for Oregon Trial Lawyers Association.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

## LEESON, J.

Plaintiff brought this action for damages for personal injuries she sustained after receiving medical treatments to remove facial wrinkles. Defendant Marshall, her physician, administered four injections of Zyderm and Zyderm FL, products designed, manufactured and marketed by defendant Collagen Corporation (Collagen). Plaintiff appeals from the trial court's grant of summary judgment for defendants on the ground that all of plaintiff's claims are preempted by the Medical Device Amendments of 1976 (MDA) to the Food, Drug and Cosmetics Act, 21 USC § 301 *et seq*. We affirm with respect to all claims against Collagen, but reverse and remand, in part, with respect to the claims against Marshall.

Zyderm is a medical implant composed of purified bovine collagen, a protein extracted from calf hide that is similar to the human collagen that provides texture and suppleness to the skin. Zyderm is injected into the skin to smooth out facial contours such as smile and frown lines that result as the naturally occurring collagen in the skin breaks down as part of the aging process. Treatment consists of a skin test to determine whether the prospective patient has any untoward sensitivity to the material, followed by a series of injections at intervals of at least two weeks. Because the cosmetic effects are not permanent, most patients choose to receive touch-up treatments within 6 to 24 months. Plaintiff received injections of Zyderm in April, May and June 1991 and of Zyderm FL in August 1991. Zyderm FL contains the same collagen material as Zyderm, but it is injected with a smaller gauge needle to correct fine lines that develop around the eyes.

Under the MDA, medical devices intended for human use are classified by the federal Food and Drug Administration (FDA) into one of three categories, depending on the level of regulation needed to provide reasonable assurances of safety and effectiveness. *See* 21 USC § 360c (establishing classifications). Class I devices pose little or no threat to health and safety and are subject to only general controls over manufacturing processes. *Id.* at § 360c(a)(1)(A). Tongue depressors, elastic bandages, ice bags and bed pans are common examples of Class I devices. Robert S. Adler and Richard

A. Mann, *Preemption and Medical Devices: The Courts Run Amok*, 59 Mo L Rev 895, 913 (1994). Class II devices are more complex, requiring special controls such as performance standards, postmarket surveillance, patient registries, guidelines and recommendations deemed necessary to assure safety and effectiveness. 21 USC § 360c(a)(1)(B). Examples of Class II devices are syringes, hearing aids, bone plates, and condoms. Adler and Mann, 59 Mo L Rev at 913. Class III devices are those that cannot be classified into Classes I or II because of insufficient information to determine whether general controls will "provide reasonable assurances of [their] safety or effectiveness," and are either purported to be "for a use in supporting or sustaining human life or * * * of substantial importance in preventing impairment of human health" or "present a potential unreasonable risk of illness or injury." 21 USC § 360c(a)(1)(C). Class III devices include pacemakers, IUDs and replacement heart valves. Adler and Mann, 59 Mo L Rev at 914. The Zyderm collagen implants in this case are Class III devices.

The manufacturer of a Class III device must obtain premarket approval (PMA) from the FDA by submitting an application that presents all available scientific knowledge concerning investigations of the device's safety and effectiveness; detailed information regarding its design, components, ingredients, properties, and principles of its operation; a full description of manufacturing methods and facilities; any applicable performance standards; samples of the device; specimens of proposed labeling; and other information deemed relevant by the FDA.[1] 21 USC § 360e(c)(1); 21 CFR

---

[1] There are two exceptions to the Class III PMA requirement: devices that are granted an investigational device exemption (IDE) under 21 USC § 360j(g) to allow clinical testing on humans; and devices that are determined to be "substantially equivalent" to a device that was on the market before the MDA became effective in 1976, which are subject only to a less rigorous 90 day premarket notification process under 21 USC § 360(k).

The "substantially equivalent" exception is noteworthy here because preemption analysis regarding such devices is different than for devices like Zyderm that undergo the PMA process. Despite the strengthened procedure for determining substantial equivalence enacted in the Safe Medical Devices Act of 1990, Pub L 101-629, § 4, 104 Stat 4515, 4517; 21 USC §360c(i), such a determination "is not equivalent to an approval by the FDA of the device's safety and effectiveness." HR Rep No 101-808, 101st Cong 2d Sess 14 (1990), *reprinted in* 1990 USCCAN 6305, 6307; *see also* 21 CFR § 807.97 (determination that device is "substantially equivalent" does not in any way denote official approval by the FDA). Plaintiff

§ 814.20. PMA applications are reviewed by a panel of experts, which makes recommendations to the FDA. 21 USC § 360e(c)(2). The FDA may approve a device for sale or return the application for additional information or testing of the device. *Id.* at § 360e(d)(1). The FDA must inform the applicant of the measures needed to correct a deficient application. *Id.* at § 360e(d)(2).

■ Even after a PMA application has been approved, a device remains subject to post-approval regulation. *Id.* at § 360e(e); 21 CFR § 814.82(a). The manufacturer must maintain certain records and make reports to the FDA, 21 USC § 360i; 21 CFR § 814.82, and must not manufacture, package, store, label, distribute or advertise the device "in a manner inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 CFR § 814.80. With only minor exceptions, the manufacturer must also submit a PMA supplement for FDA review and approval before making changes that affect the safety or effectiveness of an approved device. 21 CFR § 814.39. The FDA retains the power to withdraw approval of a device on the basis of new information, or if it discovers that the manufacturer submitted false or misleading information in its PMA application or otherwise fails to comply with the MDA or conditions of PMA approval. 21 USC § 360e(e). The FDA has limited remedial power to require the manufacturer to notify the public of newly discovered risks; to order repair, replacement, or refund of the purchase price of a device; and to order recall of a device. *Id.* at § 360h. Additionally, a device manufacturer is subject to criminal penalties for certain prohibited acts and may be assessed civil penalties by the FDA. *Id.* at §§ 331, 333. It is generally understood, and the parties in this case do not disagree, that there is no private right of action under the Food, Drug and Cosmetics Act. *See Talbott v. C.R. Bard, Inc.,* 865 F Supp 37, 45 (D Mass 1994), *aff'd* 63 F3d 25 (1st Cir 1995) (citing four federal circuit court cases and four federal district court cases so holding); *see also King v. Collagen Corp.,* 983 F2d 1130, 1140 (1st Cir), *cert den* ____ US ____, 114 S Ct 84, 126 L Ed 2d 52 (1993) (no implied right of action).

---

inappropriately cites as persuasive authority cases involving Class III devices marketed subject to premarket notification procedures. *See, e.g., Larsen v. Pacesetter Systems, Inc.,* 74 Haw 1, 837 P2d 1273 (1992).

The FDA, upon recommendation of its Surgical and Rehabilitation Devices Panel, approved Collagen's PMA application for Zyderm by letter on July 22, 1981, and by order published on September 18, 1991. 46 Fed Reg 46,394 (1981). PMA approval was made subject to a set of conditions including an extension of the post-approval immunological study; distribution with the device of a patient information brochure; submission in final printed form of labeling and informational package inserts; prior submission of PMA supplements before making changes involving indications for use, labeling, manufacturing, packaging or ingredients; and required reports. Between initial PMA approval and the time plaintiff began treatment, Collagen had submitted 16 PMA supplements seeking approval for changes in ingredients, manufacturing processes, labeling and physician's package inserts. Changes were approved only after Collagen complied with FDA requests to submit additional data or to include specified language on labels or physician's package inserts.

Plaintiff alleges that the injections administered by Marshall triggered immune and autoimmune reactions that caused "numbness, swelling and soreness in her face; dizziness; vertigo; and visual disturbances[,]" some of which "more likely than not, will be permanent." She brought this action against Collagen and Marshall on claims of strict products liability, breach of express warranties and breach of implied warranties of merchantability and fitness; against Collagen on a claim of negligence; and against Marshall on a claim of medical negligence, including counts of breach of the duty of care and failure to obtain informed consent. The trial court granted Marshall's motion for summary judgment on the claims against him for strict products liability, breach of implied warranties and breach of express warranty with respect to the device itself, but denied the motion "as to the alleged warranty of the services" and the medical negligence claims. While that motion was pending, plaintiff filed a second amended complaint reiterating the claims against both defendants, but further alleging as part of each claim that Zyderm FL had not been approved by the FDA at the time of plaintiff's injection with that product. Subsequently, each defendant moved for summary judgment on the grounds that plaintiff's claims are preempted by the MDA and are also barred by the statute of limitations. The trial court entered judgment on its

orders granting summary judgment to both defendants "under the doctrine of federal preemption with respect to Zyderm Collagen Implant and Zyderm FL."

On appeal, plaintiff's three assignments of error involve preemption analysis under the MDA. She argues that the trial court erred in holding: (1) that her claims are preempted with respect to the manufacturer, Collagen; (2) that even if her claims against Collagen are preempted, they are not with respect to her treating physician, Marshall; and, (3) that even if claims against both defendants are preempted, preemption would be proper only for claims involving Zyderm, not Zyderm FL. Marshall cross-assigns error to the trial court's denial of his first motion for summary judgment with respect to plaintiff's breach of warranty claim.[2] We view the evidence and all reasonable inferences in the light most favorable to plaintiff to determine whether defendants are entitled to judgment as a matter of law. *Stevens v. Bispham*, 316 Or 221, 223, 851 P2d 556 (1993).

■ Federal preemption is predicated on the Supremacy Clause of the United States Constitution, which provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." US Const, Art VI, cl 2. It is well settled that federal law supersedes conflicting state law, but that Congress's intent to displace the historic police powers of the states must be clearly manifest. *Cipollone v. Liggett Group, Inc.*, 505 US 504, 112 S Ct 2608, 2617, 120 L Ed 2d 407, 422 (1992). Although preemption may be implied where federal law conflicts with state law or where federal law thoroughly occupies a legislative field, when Congress has included an express preemption provision in a statute, the court must "identify the domain expressly preempted" and not look beyond it to imply preemption. *Id.* at 517, 112 S Ct at 2618. We read the express provision narrowly, however, in the light

---

[2] Marshall's brief characterizes the trial court's denial of the motion for summary judgment with respect to "breach of an *implied* warranty of service." (Emphasis supplied.) The trial court's order specifically denied in part the motion involving the "Third Claim for Relief for breach of express warranty." Plaintiff's fourth claim for relief, for which Marshall was granted summary judgment, was the claim for breach of implied warranty. We take Marshall's assignment to suggest that the trial court erred with respect to plaintiff's express warranty claim.

of the presumption against preemption of state police power. *Id.* Nevertheless, we will construe the statutory language according to its plain meaning unless there is good reason to believe that Congress intended a more restrictive reading. *Id.* at 521, 1125 S Ct at 2620.

The preemption provision in the MDA provides:

"(a)   Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement —

"(1)   which is different from, or in addition to, any requirement applicable under this chapter to the device, and

"(2)   which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." 21 USC § 360k.[3]

Following the guidance of *Cipollone*, we read that provision to mean that the MDA only preempts a state "requirement" if there is a "requirement" applicable to the device under the MDA, and if the state requirement differs from or adds to the MDA requirement and relates to safety, effectiveness or other matters applicable to the device made mandatory under the MDA.

At the outset, we address plaintiff's two overarching arguments regarding the meaning of the term "requirement": (1) that state common law or tort law does not establish a state "requirement" within the meaning of the MDA, and (2) that a "requirement" applicable to the device under the MDA is established only by "a *regulation* specifically addressing *the* device." (Emphasis supplied.)

Plaintiff contends that state "requirements" refer only to positive enactments such as statutes or administrative rules that specifically address a device. She argues that, because of the presumption against preemption of state police power, state tort and common law claims are preempted only if Congress clearly states its intent to do so. Defendants respond that the term "requirement" encompasses state tort and common law, because adverse court decisions would have

---

[3] Subsection (b) allows a state to apply for and the FDA to grant an exemption to subsection (a) under certain conditions not relevant here.

the effect of forcing a manufacturer to make changes to its device, labeling or other matters that are under the strict control of the FDA. They contend that the MDA provides for blanket preemption of all state common law and tort claims. We agree with defendants that preemption is not limited to positive enactments, but, as explained below, do not agree that the MDA provides for blanket preemption of all state common law and tort claims.

■ Congress has given authority to the FDA to promulgate regulations interpreting the MDA. 21 USC § 371(a). Thus, we first turn to the agency's regulations for guidance. *See Hillsborough County v. Automated Medical Labs.*, 471 US 707, 714-15, 105 S Ct 2371, 85 L Ed 2d 714 (1985) (agency regulations are dispositive unless they present interpretation inconsistent with clear Congressional intent); *Chevron U.S.A. v. Natural Res. Def. Council*, 467 US 837, 843, 104 S Ct 2778, 81 L Ed 2d 694 (1984) (agency's reasonable construction of ambiguous statute is controlling). The FDA has interpreted the MDA's preemption provision as preventing a state from

> "establish[ing] or continu[ing] in effect any *requirement* with respect to a medical device intended for human use *having the force and effect of law* (whether *established by* statute, ordinance, regulation or *court decision*), which is different from, or in addition to, any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act." 21 CFR § 808.1(b). (Emphasis supplied.)

Because the legislative history does not provide a clear expression of Congress's intent to limit the scope of preemption, we find that regulation controlling.[4] Moreover, in *Cipollone* the Court, relying on *San Diego Unions v. Garmon*, 359 US 236, 247, 79 S Ct 773, 3 L Ed 2d 775 (1959), noted that

---

[4] The only portion of the legislative history of the MDA that addresses section 360k discusses Congress's concern with the burden on interstate commerce that would result from a state's imposition of PMA procedures and the authorization of such state requirements only through petitions for exemption submitted to the FDA. Robert S. Adler and Richard A. Mann, *Preemption and Medical Devices: The Courts Run Amok*, 59 Mo L Rev 895, 924 n 131 (1994) (citing HR Rep No 853, 94th Cong, 2d Sess 45 (1976)). *See also* S Rep No 33, 94th Cong, 2d Sess 5 (1976), *reprinted in* 1976 USCCAN 1070, 1075.

an award of damages is a "potent method of governing conduct and controlling policy" and serves as an effective method to exert state regulation. Consequently, it concluded that

"[t]he phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." 505 US at 521, 1125 S Ct at 2620.[5]

In the light of those authorities, it would be inconsistent for us to interpret the term "requirement" differently. *See Stamps v. Collagen Corp.*, 984 F2d 1416, 1421 (5th Cir), *cert den* ___ US ___, 114 S Ct 86, 126 L Ed 2d 54 (1993) (relying on *Cipollone* for interpretation of state "requirement" under MDA). We therefore hold that, under the MDA, a state "requirement" encompasses state common law and tort law.[6]

■       Nonetheless, for preemption to occur, there must also be "a requirement applicable under [the MDA] to the device." 21 USC § 360k(a)(1). Plaintiff argues that state law is preempted only when the FDA has established specific regulations that relate to a particular device. According to plaintiff, her claims cannot be preempted, because there are no codified federal regulations that uniquely govern collagen implants as compared with other medical devices. Defendants insist that the PMA approval process for Class III devices necessarily establishes requirements applicable to the device. We agree with defendants.

---

[5] Although this portion of *Cipollone* was decided by a plurality of the Court, the 'stated propositions are endorsed in the dissenting opinion by Justice Scalia. *Cipollone*, 505 US at 548, 112 S Ct at 2634. *See also CSX Transportation v. Easterwood*, 507 US ___, 113 S Ct 1732, 1737-38, 123 L Ed 2d 387, 397 (1993) (quoting *Cipollone* for the proposition that a federal statute barring "requirement[s] . . . imposed under state law" preempts common law claims). We are convinced that the opinion of the Court in *Cipollone* expresses its most contemporary analytical approach to express preemption. *See, e.g., American Airlines, Inc. v. Wolens*, 513 US ___, 115 S Ct 817, 130 L Ed 2d 715 (1995) (applying same analytical framework).

[6] *Anguiano v. E.I. Du Pont De Nemours & Co., Inc.*, 44 F3d 806, 809 (9th Cir 1995), states in dictum that Congress expressly intended to preempt state tort law, citing with approval decisions from the first and fifth circuits. *See Mendes v. Medtronic, Inc.*, 18 F3d 13, 16 (1st Cir 1994); *Stamps v. Collagen Corp.*, 984 F2d 1416, 1420 (5th Cir), *cert den* ___ US ___, 114 S Ct 86, 126 L Ed 2d 54 (1993); *King v. Collagen Corp.*, 983 F2d 1130, 1133 (1st Cir), *cert den* ___ US ___, 114 S Ct 84, 126 L Ed 2d 52 (1993).

The FDA has determined that:

> "State or local requirements are preempted only when the [FDA] has established specific counterpart regulations *or* there are *other specific requirements applicable to a particular device* under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, specific [FDA] requirements." 21 CFR § 808.1(d). (Emphasis supplied.)

Thus, according to the FDA, preemption does not apply when the FDA has neither issued a regulation nor established other requirements specific to the particular device. That interpretation is reasonably consistent with the preemption provision in the statute and, because there is no clear indication of contrary Congressional intent in the legislative history, it is controlling. *Chevron U.S.A.*, 467 US at 843.

■     In this case, there is no indication in the record that the FDA has issued a specific counterpart regulation for Zyderm. However, through the PMA process the FDA makes specific determinations related to a Class III device's design, ingredients, manufacturing, packaging, labeling (including patient brochure and physician's package insert), use, storage, advertising and marketing, and makes continuing approval subject to compliance with the conditions it imposes. It did so with respect to Zyderm. After PMA, Zyderm was subject to continuing regulation, including ongoing record keeping and reporting. Collagen was prohibited from making changes related to the conditions of approval without first submitting a PMA supplement. Indeed, the PMA process established requirements that governed nearly every aspect of Zyderm's commercial existence. The extensive conditions imposed through the PMA regulatory scheme are sufficiently specific to Zyderm to comprise requirements within the meaning of that term under section 360k.[7]

---

[7] This conclusion is consistent with all existing authority of which we know. To the extent that cases hold that the MDA regulatory scheme does not of itself establish specific requirements necessary to trigger preemption, the devices at issue were either Class II devices for which performance standards had not yet been issued or were Class III devices subject only to the "substantially equivalent" premarket notification procedure of 21 USC section 360(k). Plaintiff's reliance on the latter set of cases is, therefore, misplaced. *Compare, e.g., Michael v. Shiley, Inc.*, 46 F3d 1316, 1324 (3d Cir 1995) (PMA process subjects device to FDA "requirements"); *Martello v. CIBA Vision Corp.*, 42 F3d 1167, 1169 (8th Cir), *cert den* ____ US ____, 115 S Ct 2614 (1994) (same); *Stamps*, 984 F2d at 1421 (same); *King*, 983 F2d at 1134 (same)

■ Nonetheless, not all state requirements relating to a Class III device subject to the PMA process are necessarily preempted. State requirements must also be "different from, or in addition to" the requirements established under the MDA and must relate to safety or effectiveness or other matters regulated by the MDA. 21 USC § 360k(a)(1). The MDA's preemption provision, like the preemption provision of the Public Health Cigarette Smoking Act of 1969,[8] Pub L 91-222, 84 Stat 87, 15 USC §§ 1331-1340, interpreted in *Cipollone*, does not expressly preempt common law remedies, nor does it include a clause expressly preserving common law claims, thereby indicating that some common law claims are to be preempted and others are not. *Cipollone*, 505 US at 524 n 22, 112 S Ct at 2621 n 22. Neither statute indicates that "any familiar subdivision of common law claims is or is not preempted." *Id.* at 523, 112 S Ct at 2621. Accordingly, we must examine each of plaintiff's common law and tort claims to determine whether the legal duty that is the predicate to the damages action constitutes a state requirement that is different from, or in addition to, a requirement made applicable to the device by the MDA, giving section 360k a fair but narrow reading. *Id.* Only state common law or tort claims that, if successfully litigated, would establish or continue any requirement that differs from or adds to an MDA requirement, are preempted. *Mendes v. Medtronic, Inc.*, 18 F3d 13, 18 (1st Cir 1994); *King*, 983 F2d at 1134-35. The claims that

---

*with Anguiano* 44 F3d at 810 (no preemption with respect to Class II jaw prosthesis subject only to identification regulation); *Ginochio v. Surgikos, Inc.*, 864 F Supp 948, 953 (ND Cal 1994) (same; involving Class II knee prosthesis subject only to identification regulation); *Oja v. Howmedica, Inc.*, 848 F Supp 905, 907 (D Colo 1994) (no preemption where hip replacement subject only to premarket notification regulations); *Larsen*, 74 Haw at 16 (no preemption where Class III pacemaker subject only to premarket notification regulations). *See also Hoyt v. Vitek, Inc.*, 134 Or App 271, 280, 894 P2d 1225 (1995) (no preemption where FDA had issued only identification regulation for Class II jaw prosthesis).

[8] Section 5(b) of that Act provides:

"No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act."

remain viable on appeal are those in the second amended complaint that survived the trial court's partial grant of summary judgment for Marshall based on plaintiff's first amended complaint.[9]

Plaintiff first alleges that Collagen is strictly liable for marketing a defectively designed device that was unreasonably dangerous and that the labeling, including package inserts, failed to provide adequate warning to physicians or patients.

As described above, the MDA places on the FDA the responsibility for determining whether a medical device is safe and effective for its intended use. The entire MDA scheme for PMA and post-approval regulation of a Class III device such as Zyderm creates a set of requirements that reflect the FDA's determination that a device is safe and effective. Congress had a dual purpose in passing the MDA: to protect individuals by keeping harmful products off the market, and to benefit society as a whole by encouraging scientific innovation through expediting the approval process to permit new and improved medical devices to be marketed without delay. S Rep No 33, 94th Cong 2d Sess 1, 6 (1976), *reprinted in* 1976 USCCAN 1070, 1071, 1075. It is apparent that Congress chose to balance those competing interests by relying exclusively on the FDA to determine when a device is sufficiently safe to be marketed. *King*, 983 F2d at 1137-38; *see also Talbott*, 865 F Supp at 40 (reaching same conclusion, but questioning whether the FDA approval process is most fair and effective means). A successful design defect claim would require the manufacturer to redesign its product, remove it from the market or subject itself to potentially devastating financial liability. A determination by a judge or jury that a device is dangerous would be contrary to the FDA's determination and would impose requirements that differ from those mandated under the MDA. The MDA's preemption provision prohibits that result. The trial court was correct that section 360k(a) protects Collagen from a claim that Zyderm, a Class III device approved by the FDA, was defectively designed.

---

[9] Although the record contains a third amended complaint, there is no indication that leave to amend was requested or granted by the court or consent of defendants. ORCP 23 A. Therefore, we disregard the additional allegations in that complaint.

■    Plaintiff's strict liability claim also asserts that Zyderm's labeling, including the patient brochure and the physician's package insert, failed to adequately warn both her and her physician of the risks associated with that product's use. The FDA regulated the form and substance of those printed items. It required premarket submission and approval of all written materials, required PMA supplements for all changes and even demanded specific wording regarding risks, warnings and precautions in the patient brochure and the physician's package insert as a condition of approval of some PMA supplements. Plaintiff's claim challenges the adequacy of the FDA's requirements. If she succeeded on her failure to warn theory, Collagen would be forced to deviate from the labeling and packaging requirements imposed by the FDA, a result that is foreclosed by the MDA. The trial court did not err in granting Collagen's motion for summary judgment on this claim.

■    Plaintiff next argues that Collagen was negligent in developing, researching, designing, testing and marketing Zyderm and in failing to adequately warn the medical community about the known risks associated with its use. As described previously, the MDA extensively regulates the design, manufacture, packaging and marketing of Class III devices. It does so by requiring FDA approval of such devices through the PMA process. Collagen's PMA application for Zyderm included submission of all available research and testing information. That information, along with the design specifications, manufacturing practices and labeling samples, was evaluated by a panel of experts that made recommendations to the FDA. Approval of the PMA application for Zyderm by the FDA was made subject to a set of conditions. Although those conditions included extension of the post-approval immunological study, the FDA had determined that the information that Collagen submitted provided reasonable assurance that Zyderm is safe and effective for use under conditions described in the labeling, that the labeling was not false or misleading, and that the manufacturing methods and facilities conformed to FDA requirements. *See* 21 USC § 360e(d)(2) (criteria mandating denial of PMA). A finding of negligence would negate the FDA's determination and impose different or additional requirements on Collagen with respect to research and development, design, manufacture,

testing and labeling, including warnings approved by the FDA. Accordingly, the trial court did not err in ruling that all negligence claims against Collagen regarding Zyderm are preempted.

■    Plaintiff next contends that Collagen breached the implied warranties of merchantability and fitness for a particular purpose. Those warranties arise by operation of state law in the sale of any goods. ORS 72.3140; ORS 72.3150. Establishing a breach would require a finding by the court that Zyderm is flawed under state trade standards with respect to its description, quality, fitness for its ordinary purpose or known particular purpose, packaging or labeling, *id.*, and impose requirements that are different from, or in addition to, those already imposed by the FDA. The trial court correctly concluded that plaintiff's claim for breach of implied warranties is precluded.

Plaintiff also claims that Collagen breached express warranties. In her second amended complaint, she alleges that through brochures and other product information aimed at and written for patients, Collagen

> "warranted that the devices were safe and effective for their intended use, and could not cause autoimmune damage or disease or any significant immune damage. Plaintiff relied on this information in undergoing injections with the devices."[10]

Plaintiff relies on *Cipollone* for the proposition that a breach of express warranty claim is not preempted, because an express warranty is voluntarily undertaken by a manufacturer itself and "should not be regarded as a 'requirement . . . imposed under State law.' " 505 US at 526, 112 S Ct at 2622. Defendant argues that *Cippolone* is distinguishable, because the representations that formed the basis for the plaintiff's claim for breach of express warranty in that case were voluntarily undertaken and were not required by federal law. Plaintiff does not dispute that statements in the product brochures and patient information supplied by Collagen were required by the FDA. Instead, she reads *Cippolone* broadly, as

---

[10] The quoted phrase is from plaintiff's second amended complaint. It does not purport to quote language from Zyderm's patient brochure or physician's package insert.

holding that claims for breach of any express warranties are not preempted by federal law.

■ Plaintiff is correct that, under *Cipollone*, a common law remedy for a contractual commitment voluntarily undertaken should not be regarded as a requirement imposed under state law. In *Michael v. Shiley*, 64 F3d 1316 (3d Cir 1995), for example, the manufacturer of a heart valve included the following warranty on its product label, in addition to the information and warnings required by the FDA:

> "Shiley warrants that reasonable care has been used in the manufacture of this device. This warranty is exclusive and in lieu of all other warranties, whether express, implied, written or oral." *Id.* at 1326.

The plaintiff contended that Shiley breached that warranty. Because the warranty arose from the representations of the manufacturer, and did not result from the independent operation of state law, the Third Circuit Court of Appeals ruled that the plaintiff's express warranty claim was not preempted. *Id.* at 1325. *Ministry of Health v. Shiley*, 858 F Supp 1426 (CD Cal 1994) also involved an allegation of breach of warranty that reasonable care had been used in the manufacture of the Shiley heart valve. In that case, the court likewise ruled that the plaintiff's breach of warranty claim was not preempted.

■ In this case, the representations made by Collagen were not undertaken voluntarily. They were required and approved by the FDA. Unlike the representations at issue in *Cippolone*, therefore, the enforcement of Collagen's representations in this case would directly implicate federal law, because the imposition of liability on the basis of those statements would impose a "requirement" under state law beyond what is required by the MDA. As the court in *King* explained:

> "The FDA retains rigid control over the entirety of the labeling and packaging of class III products[, unlike cigarette advertising at issue in *Cipollone*], largely displacing the ability of manufacturers to make additional claims. This high level of control contrasts with the low level of control in *Cipollone*, and ensures that manufacturers will not be held liable for packaging and labeling imposed by the FDA." 983 F2d at 1135.

Consequently, under these facts, the trial court did not err in ruling that plaintiff's express warranty claim is preempted.

Plaintiff also alleges, as part of her strict products liability and negligence claims against Collagen, that Collagen knowingly submitted false, fraudulent, misleading and incomplete information to the FDA to obtain FDA approval.[11] We understand plaintiff's argument to be that perpetrating a fraud on the FDA should serve to deprive Collagen of its preemption defense, thereby creating an exception to federal preemption of common law and tort claims.

■   Plaintiff's theory would require a court to determine whether the information submitted by Collagen to the FDA was truthful and complete. Further, even if the submitted information was found to be incomplete or inaccurate, the court would be required to inquire into the adequacy of the FDA's approval procedures and to determine if any errors were significant enough to require revocation of approval or to mandate changes in the required labeling. As previously stated, Congress has given responsibility to the FDA to manage the PMA process and to decide what information is necessary and sufficient to grant approval for a device. If state courts were permitted to second guess the FDA's conclusions, they would impose requirements that differ from or add to the requirements under the MDA. That would be impermissible under section 360k. Moreover, to allow a fraud-on-the-FDA exception to the preemption provision would, in effect, create a private right of action where none presently exists. *See King*, 983 F2d at 1140 (Aldrich, J., concurring) (a fraud exception would run afoul of the general principle against implying personal causes of action); *see also Talbott*, 865 F Supp at 47 (no private right of action under the MDA). Congress has given only the FDA and other federal agencies the right and responsibility to take remedial action and to litigate claims that the FDA has been defrauded.[12] *See* 21

---

[11] Although plaintiff seems to argue that her *claim* of fraudulent misrepresentation is not preempted, the allegations regarding fraud are imbedded within the claims for strict products liability and negligence. Technically, her complaint does not suffice to state a claim for fraud, ORCP 16 B, and the trial court did not treat it as a separate claim.

[12] In a July 1991 letter to the FDA, the Subcommittee on Oversight and Investigations of the U.S. House of Representative's Committee on Energy and Commerce inquired into allegations about improper testing protocols and Collagen's

USC §§ 331, 333, 360e, 360h (identifying prohibited acts and remedies available under the MDA, including criminal and civil penalties and withdrawal of PMA for misstatements of material fact). To recognize an exception to preemption based on an allegation of fraud would undermine the regulatory scheme created by Congress.[13] *Accord Michael*, 46 F3d at 1329; *King*, 983 F2d at 1140.

Finally, as part of her claims of strict products liability and negligence against Collagen, plaintiff alleges that Zyderm FL was not an approved device. She assigns error to the dismissal of her claims regarding Zyderm FL in the grant of summary judgment for Collagen. She contends that federal preemption can only protect a manufacturer of a device approved by the FDA and that, because Collagen did not submit a PMA application or a PMA supplement for Zyderm FL before plaintiff was injected with that product, her claims involving Zyderm FL cannot be preempted. Plaintiff's argument reduces to a claim that Collagen's failure to comply with MDA procedures precludes application of that statute's preemption provision. Collagen argues that Zyderm FL is identical to Zyderm, except that a smaller (32 gauge) needle is provided to facilitate treatment of fine lines around patients' eyes. It concedes that it may have committed a technical violation of the MDA by failing to submit a PMA supplement before marketing Zyderm FL, but contends that the correction of any oversight was addressed by the FDA pursuant to the statutory scheme. According to Collagen, plaintiff's claims involving Zyderm FL are also preempted. We agree.

■ Collagen submitted a premarket notification to the FDA in January 1991 for marketing of a 32 gauge needle for use with Zyderm. In April 1991, the FDA informed Collagen that needles were exempt from premarket notification requirements. Collagen subsequently began to market Zyderm FL, including both the implant material and the fine

---

withholding of statistical information involving adverse reactions to Zyderm. The FDA conducted an independent review of the original PMA application and affirmed the propriety of the approval decision.

[13] We note also that this result will not always deprive individuals of all compensation for injury resulting from an approved Class III device. A criminal sentence may include an order for restitution, although it cannot include compensation for pain and suffering or punitive damages. 18 USC § 3663.

gauge needle, mistakenly believing that it was unnecessary to submit a PMA supplement. Although there were differences in the labeling compared to Zyderm, it believed that, because the changes reflected only the intended use for treatment of finer lines and did not affect the safety or effectiveness of the device, a PMA supplement was not needed. *See* 21 CFR § 814.39 (describing changes that require a PMA supplement). Plaintiff received a Zyderm FL injection on August 13, 1991. On August 16, the FDA seized Collagen's inventory of Zyderm products because of misbranding allegations stemming from omissions in the labeling. The FDA subsequently learned that some of the seized inventory included Zyderm FL, a product for which no PMA or PMA supplement had been submitted. In October 1991, Collagen submitted a PMA supplement for Zyderm Collagen Implant with Fine Gauge Needle (formerly called Zyderm FL), including changes to the previously approved Zyderm labeling to reflect the new description and intended use. The FDA approved that PMA supplement in January 1992.

Approval of the PMA supplement demonstrates that the FDA recognized Zyderm FL as a form of Zyderm, which it had previously approved. *See* 21 CFR § 814.39 (PMA supplement is used when changes are made to an approved device). The MDA and its implementing regulations specify when a manufacturer must submit a PMA supplement. *Id.* The MDA also requires that a manufacturer provide complete and accurate information as part of its PMA application. 21 USC § 360e; 21 CFR § 814.20. Thus, in effect, plaintiff's argument is the same argument already rejected with respect to the alleged fraud on the FDA. A manufacturer's failure to comply with the MDA's requirements does not serve as an exception to the preemption provision. *Accord Talbott*, 63 F3d 25. Therefore, the trial court did not err in ruling that plaintiff's claims of strict products liability and negligence with respect to Zyderm FL are preempted.

We now turn to plaintiff's claims against Marshall and her contention that the trial court erred in granting summary judgment in favor of Marshall. The trial court concluded that all of plaintiff's claims against Marshall are "based upon injection of Zyderm and Zyderm FL," and that

Marshall is "entitled to the same protection under the doctrine of federal preemption" as that afforded to Collagen. Plaintiff argues that even if claims against a manufacturer are preempted, the MDA and its regulatory scheme do not similarly shield a treating physician. Marshall responds that plaintiff's claims against him are derivative of her claims against Collagen and hence are preempted.

As with each claim against Collagen, we examine each of plaintiff's claims against Marshall to determine whether the legal duty that is the predicate to the damages action constitutes a state requirement that is different from, or in addition to, a requirement made applicable to the device by the MDA, giving section 360k a fair but narrow reading. *Cipollone*, 505 US at 523, 112 S Ct at 2621. Claims against Marshall are preempted only if successful litigation would establish or continue a requirement with respect to the device that differs from or adds to an MDA requirement. *See King*, 983 F2d at 1134-35 (suggesting the test and acknowledging that certain claims such as negligent implantation of a device are not preempted).

Plaintiff first claims that Marshall's medical treatment was negligent in that he breached his duty of care, ORS 677.095, and failed to obtain her informed consent, ORS 677.097.[14] She alleges that he breached the duty of care in one

---

[14] ORS 677.095 provides:

"A physician * * * has the duty to use that degree of care, skill and diligence which is used by ordinarily careful physicians * * * in the same or similar circumstances in the community of the physician * * * or a similar community."

ORS 677.097 provides:

"(1) In order to obtain the informed consent of a patient, a physician * * * shall explain the following:

"(a) In general terms the procedure or treatment to be undertaken;

"(b) That there may be alternative procedures or methods of treatment, if any; and

"(c) That there are risks, if any, to the procedure or treatment.

"(2) After giving the explanation specified in subsection (1) of this section, the physician * * * shall ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician * * * shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so would be materially detrimental to the patient. In determining that further explanation would be materially detrimental the physician * * * shall give due consideration to the standards of practice of reasonable medical * * * practitioners in the same or a similar community under the same or similar circumstances."

or more of the following ways: by failing to educate himself about the risks associated with the devices; in failing to inform plaintiff of the risks and consequences of injection with Zyderm products; in selling and administering the devices; and in failing to determine whether Zyderm FL was approved by the FDA. She also alleges that he failed to obtain informed consent in that he did not advise her of the risks associated with use of Zyderm products and did not provide a more detailed explanation of the procedure or the risks. Plaintiff received whatever warnings the FDA mandated be given to patients in the patient brochure. Marshall contends that he also "informed the patient of the risks * * * and explained the procedure of such injection" and provided treatment "consistent with the degree of care, skill and diligence" required by the standards of his profession. Plaintiff contends that, although she requested information about the devices from Marshall, he gave no warnings and described no risk, and specifically told her that there is "[n]o way [Zyderm] could harm you." Plaintiff also claims that Marshall's statement created an express warranty, which he subsequently breached.

■■ ■■ Breach of the duty of care is a legally distinct claim from failure to obtain informed consent. *Gaston v. Parsons*, 318 Or 247, 259-60, 864 P2d 1319 (1994). Plaintiff alleges that Marshall breached his duty of care by failing to inform her of the risks and consequences of injection with Zyderm products. Providing appropriate information about the risks of the proposed treatment is a component of obtaining informed consent. Therefore, the claim for breach of duty for failure to inform is redundant of her claim that he failed to obtain her informed consent. Similarly, her claim for breach of express warranty as to services is no more than a claim that Marshall failed to provide the warning required under ORS 677.097. Accordingly, we do not address those claims separately from the claim that he failed to obtain plaintiff's informed consent.[15]

---

[15] Because we hold that plaintiff's claim of breach of express warranty as to services is redundant of her lack of informed consent claim, we need not address Marshall's cross-assignment that the trial court erred in denying his motion for summary judgment on plaintiff's breach of express warranty of services claim.

■    To the extent that plaintiff's breach of the duty of care claim is predicated on Marshall's selling and administering the Zyderm products and in failing to determine whether Zyderm FL was approved, that claim is preempted. As we have already discussed at length, the FDA had approved Zyderm for the use to which it was employed by Marshall. Zyderm FL is a form of the approved device administered with a finer gauge needle. Under the MDA, the FDA is given exclusive authority to determine whether a medical device is safe and effective. Plaintiff's claim suggests that medical practitioners must assume independent responsibility to determine if a medical device is safe and effective. Under plaintiff's theory, Marshall would be negligent in administering the Zyderm products if his professional judgment about the products' safety fell below a state standard. To impose liability on a physician for that judgment would be contrary to the FDA's determination that a device is safe and would impose a state requirement different from those established under the MDA. Similarly, to impose as a state standard that a physician must determine whether Collagen violated the MDA, by marketing Zyderm FL without first submitting a PMA supplement, would shift enforcement of the MDA to medical practitioners. The MDA does not allow such different state requirements.

■    However, plaintiff's claim that Marshall breached his duty of care by failing to educate himself about the risks associated with the use of Zyderm products is a different matter. The physician's package inserts for those devices contain some precautions and warnings and provide a bibliography of technical literature involving studies of the products' safety and effectiveness. Both the warnings and the bibliography are required by the FDA pursuant to the MDA. Nothing in the MDA establishes standards for physicians who receive that information. Therefore, plaintiff's claim that Marshall failed to properly educate himself is not preempted by the MDA, because there is no MDA requirement that would be displaced by holding a physician to a state standard. Moreover, the record in this case contains no evidence about whether Marshall was familiar with the information in the physician's package inserts or whether the applicable professional standard of care in Oregon requires a physician to read some or all of the bibliographical material. Because a genuine

issue of material fact exists with respect to plaintiff's claim that Marshall breached his duty of care by failing to educate himself about the risks and potential consequences of injecting her with Zyderm products, the trial court erred in dismissing that claim by summary judgment. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978).

Plaintiff also claims that Marshall failed to obtain her informed consent as required under ORS 677.097. The MDA and its implementing regulations do not establish requirements relating to the warnings that physicians must give to patients. The federal regulatory scheme mandates only what the manufacturer must tell the patient and what the manufacturer must tell the physician. The physician's package inserts for Zyderm products contain far more information than the patient brochures contain. The MDA does not require a physician to inform a patient of all the risks and consequences associated with Zyderm use, nor does it prohibit a physician from doing so. Because there is no corresponding federal requirement to the state requirement that a physician provide a detailed explanation of the risks associated with a medical procedure when the patient requests the information, the state requirement established by ORS 677.097 is not preempted. In this case, there is also a genuine factual dispute as to whether Marshall provided that explanation when plaintiff requested it. Therefore, the trial court erred in granting summary judgment on plaintiff's claim that Marshall failed to obtain her informed consent.

Finally, we address Marshall's contention that even if summary judgment was not appropriately granted on preemption, plaintiff's claims are time barred by the two-year statute of limitations under ORS 12.110. Plaintiff responds that the statute of limitations defense was not raised below and that, therefore, it cannot be raised on appeal as a ground for affirming summary judgment. We disagree. Marshall made a motion for summary judgment based on the statute of limitations. The trial court did not address that motion, because it granted summary judgment on the ground of preemption. There is a factual dispute about when each of plaintiff's claims against Marshall accrued.

Judgment for Marshall on claims for breach of the duty of care and failure to obtain informed consent reversed and remanded; otherwise affirmed.