[No. 16089-1-III.   Division Three.   July 24, 1997.]
ADELINE V. WUTZKE, *Appellant*, v. LESTER SCHWAEGLER, ET AL., *Defendants*, MENTOR, INC., ET AL., *Respondents*.

---

[34]Majority at 894.

*Marcia M. Meade* and *Dawson & Meade*, for appellant.

*Laurie D. Kohli* and *George, Hull, Porter & Kohli, P.S.* (*Maja C. Eaton, Sarah R. Lyke,* and *Sidley & Austin,* of counsel), for respondents.

SCHULTHEIS, A.C.J. — The Medical Device Amendments of 1976 (MDA) to the Federal Food, Drug and Cosmetic Act established a federal approval process for the manufacture of new medical devices. One such device, the Angelchik Anti-Reflux Prosthesis, was surgically implanted in Adeline Wutzke. Her suit against the device's manufacturer for negligent design and manufacture was dismissed on summary judgment.[1] The trial court ruled that a section of the MDA preempts all state tort actions with respect to devices approved under the MDA. Ms. Wutzke contends recent case law, including *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996), is contrary to this ruling. We reverse and remand for trial.

In the 1970s, American Heyer-Schulte Corporation developed and tested the Angelchik prosthesis, named after its chief inventor, Jean Pierre Angelchik. The device is designed to correct gastroesophageal reflux, the backward flow of stomach contents into the esophagus. Composed of a pliable silicone shell and filled with silicone gel, the "C"-shaped device is surgically implanted around the esophagus and acts like a valve to prevent regurgitation into the esophagus.

---

[1]Ms. Wutzke's claims against the inventor of the device, Jean Pierre Angelchik, and against the hospital where the implantation took place, Yakima Valley Memorial Hospital, were dismissed by stipulation in April 1992. Her claims against the implanting surgeon, Dr. Lester Schwaegler, were dismissed by summary judgment in March 1993.

Before the Angelchik prosthesis was ready for market, Congress enacted the MDA, with the intent "to provide for the safety and effectiveness of medical devices intended for human use." 90 Stat. 539 (1976), *quoted in Medtronic,* 116 S. Ct. at 2245. The amendments classify medical devices according to the risks they present to the public. Devices that present no unreasonable risk are designated Class I and are subject to only minimal regulation. 21 U.S.C. § 360c(a)(1)(A) (1994). Potentially more dangerous devices are designated Class II and must comply with federal performance regulations. *Id.* § 360c(a)(1)(B). A Class III device is one that "is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or that "presents a potential unreasonable risk of illness or injury." *Id.* § 360c(a)(1)(C)(ii). Before it may be introduced to the market, a Class III device either must be submitted to a rigorous premarket approval process (PMA) or may be approved as a device "substantially equivalent" to an existing device.[2] *Id.* § 360e(b)(1)(B), (d)(2); *Medtronic,* 116 S. Ct. at 2246-47.

Heyer-Schulte applied to the Food and Drug Administration (FDA) for premarket approval of the prosthesis as a Class III medical device in 1979. The corporation submitted over 1,400 pages of clinical, scientific, medical, design and engineering data regarding the safety and effectiveness of the device, including six years of human clinical data. In October 1979, the FDA granted approval of the device with several conditions, including the performance of a collateral clinical study. Final approval was given in August 1981, after the conclusion of the study. The prosthesis product line was sold to Mentor Corporation in 1984.

In November 1983, Dr. Schwaegler implanted an Angelchik prosthesis into Ms. Wutzke. By 1987, Ms. Wutzke was experiencing enough abdominal pain and difficulty swallowing that she consulted Dr. Lucius Hill. Dr. Hill

---

[2]Another exception to the PMA requirement grants investigative exemptions for clinical testing on humans. *Id.* § 360j(g).

operated on Ms. Wutzke in 1990 and discovered that the prosthesis had moved, causing adhesions on her liver and damage to the nerve to her stomach. He removed the device.

In September 1991, Ms. Wutzke filed suit against Drs. Angelchik and Schwaegler; Yakima Valley Memorial Hospital; American Hospital Supply Corporation and Heyer-Schulte, its wholly-owned subsidiary; Baxter Healthcare Corporation, which merged with and survived Heyer-Schulte; and Mentor Corporation, which bought the Heyer-Schulte product line. She alleged medical negligence, breach of warranty, and negligent design and manufacture of the device.

After all the defendants other than Baxter and Mentor were dismissed (note 1, *supra*), Baxter moved for summary judgment, arguing the preemption section of the MDA, 21 U.S.C. § 360k(a), preempts any state product liability claims involving Class III medical devices that have successfully undergone the PMA process. The trial court agreed, dismissed all of Ms. Wutzke's remaining claims and concluded both Baxter and Mentor were entitled to judgment as a matter of law. Ms. Wutzke's petition for review to the Supreme Court was transferred to this court on appeal.

The sole issue on appeal is whether premarket approval of a Class III medical device under 21 U.S.C. § 360 preempts state tort claims alleging the device was defectively designed and manufactured. Because the trial court limited its summary judgment ruling to the issues of law, our review is de novo.[3] *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994).

---

[3]Baxter argues on appeal that Ms. Wutzke failed to present probative evidence that the Angelchik prosthesis was unreasonably dangerous as designed, citing *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The trial court did not address the sufficiency of the evidence to support Ms. Wutzke's claims, but merely ruled the claims were preempted as a matter of law. We confine our review to the issue of law. De novo review of the record reveals, however, that Ms. Wutzke's expert witness, Lucius Hill, M.D., provides support for a claim that the prosthesis has, in his experience and research, injured others due to its defective design.

## PREEMPTION UNDER THE MDA

██ ██ Federal preemption of state law is rooted in the supremacy clause of the United States Constitution, Article VI. *All-Pure Chem. Co. v. White*, 127 Wn.2d 1, 5, 896 P.2d 697 (1995); *Berger v. Personal Prods., Inc.*, 115 Wn.2d 267, 270, 797 P.2d 1148 (1990), *cert. denied*, 499 U.S. 961 (1991). Any preemption analysis is controlled by the presumption that the historic police powers of the states are not to be superseded by federal law unless that is the clear and manifest purpose of Congress. *Medtronic*, 116 S. Ct. at 2250. Consequently, the party arguing for preemption bears a heavy burden. *Pennsylvania Med. Soc'y v. Marconis*, 942 F.2d 842, 846 (3d Cir. 1991). Preemption may be explicitly stated in the statute's language, as it is here, or implied in its structure or purpose. *All-Pure*, 127 Wn.2d at 6; *Berger*, 115 Wn.2d at 270. "Federal regulations have the same preemptive effect as federal statutes." *Berger*, 115 Wn.2d at 270.

The MDA preemption statute, § 360k, provides that a state may not establish or continue a different or additional "requirement" relating to the safety or effectiveness of a medical device:

(a) General rule

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement,

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k (1994).[4]

██ At issue is what Congress meant by the term

---

[4]Subsection (b) of the provision authorizes the Secretary, upon application of a state or political subdivision of a state, to grant exemptions for state requirements that would otherwise be preempted. 21 U.S.C. § 360k(b).

"requirement." Helpful in this regard are the regulations authorized by the FDA to interpret the MDA. 21 U.S.C. § 371(a). *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) (an agency's regulations interpreting its own statute are given deference). These regulations, found in 21 C.F.R. § 808.1, provide that a state requirement of general applicability "having the force and effect of law" is not preempted when the requirement relates to other products in addition to medical devices. 21 C.F.R. § 808.1(b), (d)(1) (1996). Further, state or local requirements are preempted only when the FDA has established specific counterpart regulations or there are other specific requirements applicable to a particular device. *Id.* § 808.1(d).[5]

---

[5]The relevant portion of 21 C.F.R. § 808.1 (1996) is as follows:

"(b) Section 521(a) of the act [codified as 21 U.S.C. § 360k(a)] . . . prescribes a general rule that . . . no State or political subdivision of a State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or court decision), which is different from, or in addition to, any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act.

". . . .

"(d) State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. . . . The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

"(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

"(2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.

". . . .

"[6](ii) Generally, section 521(a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, then the prohibi-

State statutes imposing conditions on specific devices covered by specific MDA regulations are clearly preempted.[6] *See* 21 C.F.R. § 808.1(d)(6)(ii). Divergent views arise, however, regarding the extent that Congress intended to preempt common-law and tort claims involving medical devices. Several federal and state courts have held that the term "requirement" under 21 U.S.C. § 360k encompasses state common-law and tort actions. *See, e.g., Anguiano v. E.I. Du Pont De Nemours & Co.*, 44 F.3d 806, 809 (9th Cir. 1995) (dicta); *Martello v. Ciba Vision Corp.*, 42 F.3d 1167, 1169 (8th Cir. 1994), *cert. denied*, 515 U.S. 1161, 115 S. Ct. 2614 (1995); *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 16 (1st Cir. 1994); *Green v. Dolsky*, 546 Pa. 400, 685 A.2d 110, 118 (1996), *cert. denied*, 117 S. Ct. 1432 (1997). Other courts have held that the MDA was never intended to preempt state common-law and tort actions. *See, e.g., Kennedy v. Collagen Corp.*, 67 F.3d 1453, 1459 (9th Cir. 1995), *cert. denied*, 518 U.S. 1033, 116 S. Ct. 2579 (1996); *Montoya v. Mentor Corp.*, 122 N.M. 2, 919 P.2d 410, 415-16 (1996).

■ In *Medtronic*, a plurality of the United States Supreme Court held that courts must examine three factors to determine whether § 360k preempts a state common-law or tort claim: (1) Was the state law ("requirement") developed specifically with respect to medical devices, and (2) is it different from or in addition to (3) a federal requirement specific to the particular device? 116 S. Ct. at 2257-58; *Armstrong v. Optical Radiation Corp.*, 50 Cal. App. 4th 580, 57 Cal. Rptr. 2d 763, 770 (1996). If any one of these factors is missing, the claim is not preempted. *Armstrong*, 57 Cal. Rptr. 2d at 770.

---

tion will be preempted if the requirement is different from, or in addition to, a Federal requirement established under the act. In determining whether such a requirement is preempted, the determinative factor is how the requirement is interpreted and enforced by the State or local government and not the literal language of the statute, which may be identical to a provision in the act."

[6] An example of a state requirement that relates to a particular device was noted in *Mulligan v. Pfizer, Inc.*, 850 F. Supp. 633, 635-36 (S.D. Ohio 1994). Ohio has adopted a statute that specifically pertains to hearing aids, Ohio Rev. Code Ann. § 4747.09 (Anderson 1994). In order to avoid preemption by 21 U.S.C. § 360k, the state sought and obtained a partial exemption under 21 C.F.R. § 808.85. *Mulligan*, 850 F. Supp. at 636.

The Washington Supreme Court in *Berger*, decided before *Medtronic*, held that product liability claims based on inadequate warnings and instructions are preempted by the specific federal labeling and warning requirements imposed on tampons, Class II medical devices. *Berger*, 115 Wn.2d at 271-72, 275. In 1982, the FDA adopted labeling requirements for tampons that required the manufacturers to enclose or print on the package specific warnings and information regarding toxic shock syndrome. Ms. Berger's representative (Ms. Berger died of toxic shock syndrome) claimed the tampon was unreasonably dangerous because, in part, its package contained inadequate warnings and instructions about the risks of contracting the disease. The Supreme Court held that the specific nature of the labeling and warning regulations and the fact that the tort claim would attempt to regulate matters already addressed by the FDA required the conclusion that the state tort law claim on tampon labeling and warning requirements was preempted. *Berger*, 115 Wn.2d at 271-75.

*Berger* addressed only the specificity of the labeling requirements and the plaintiff's claim that different labels and warnings should be required, factors (2) and (3) of the *Medtronic* test. Because Washington's product liability laws — the basis for the failure to warn claim — were not developed specifically with respect to medical devices, however, the *Medtronic* plurality probably would find that Ms. Berger's claim did not satisfy factor (1), defeating the preemption defense. As stated in the majority opinion, joined with Justice Breyer in his concurrence,

> the predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. . . . These state requirements therefore escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that § 360k envisioned to be "with respect to" specific devices . . . .

*Medtronic*, 116 S. Ct. at 2258, 2261. This then is the new

analysis to be applied to a claim based on a medical device's violation of state product liability law: Was the state law that serves as the basis for the claim specifically developed with respect to medical devices? *Medtronic*, 116 S. Ct. at 2258. Application of this and the other two factors of the *Medtronic* test will determine whether the trial court properly concluded Ms. Wutzke's strict liability design defect and manufacturing claims[7] were preempted.

## APPLICATION OF THE *MEDTRONIC* TEST

Ms. Wutzke contends (1) the PMA did not specifically establish design requirements for the Angelchik prosthesis, (2) Washington's tort laws were not developed with respect to medical devices, and (3) her tort claim does not attempt to establish design regulations different from or in addition to specific federal regulations. Baxter responds that the rigorous process of the PMA, including examination of the design specifications for the prosthesis, set specific design requirements. Baxter also contends the effect of a jury verdict based on negligent design would be to require the adoption of a new design.

The medical device in *Medtronic*, a pacemaker lead wire, was not subjected to the approval process of the PMA. Approved as "substantially equivalent" to another product already on the market, the device was required only to comply with general standards of safety and was not officially approved by the FDA. *Medtronic*, 116 U.S. at 2254. Thus, the "substantially equivalent" approval process did not require the pacemaker wire to follow any particular design requirements. *Id.* Accordingly, there was no federal requirement specific to the particular device (factor (3)) and no preemption of a state design defect claim. *Id.* at 2254-55. *Medtronic* did not address the hypothetical question of the effect approval under the PMA would have on design defect claims.

---

[7]Although Ms. Wutzke refers to claims for design defect and negligence in manufacturing, it is clear both relate to a strict liability theory based on the manufacture of an unreasonably dangerous product, made dangerous due to a design defect. RCW 7.72.030(1).

■ More often than not, state and federal courts have concluded that the PMA establishes specific federal requirements for design. *See, e.g., Martello*, 42 F.3d at 1169; *Armstrong*, 57 Cal. Rptr. at 771; *Kernats v. Smith Indus. Med. Sys., Inc.*, 283 Ill. App. 3d 455, 669 N.E.2d 1300, 1308 (1996), *cert. denied*, 118 S. Ct. 684 (1998); *Connelly v. Iolab Corp.*, 927 S.W.2d 848, 853 (Mo. 1996), *cert. dismissed sub nom. Iolab Corp. v. Hunter*, 117 S. Ct. 2429, 138 L. Ed. 2d 191 (1997). The general consensus is that the rigorous process of the PMA results in approval of a device's design that rises to the level of specific federal requirements. *Armstrong*, 57 Cal. Rptr. at 771. *See also Mears v. Marshall*, 137 Or. App. 390, 905 P.2d 1154, 1163 (1995) (besides the extensive conditions imposed through the PMA regulatory scheme, the FDA makes continuing approval subject to compliance with the conditions it imposes). Although a few cases, including the Ninth Circuit's *Kennedy*, have held that the approval process does not establish specific design requirements,[8] we are compelled to join the majority of courts in finding that the PMA establishes specific design requirements for Class III medical devices.

What remains is the question whether Washington's strict liability law was developed specifically with respect to medical devices. Washington's product liability law was enacted in 1981 to balance the rights of the consumer to recover for injuries sustained from an unsafe product with the interests of retail businesses in protecting themselves from "unwarranted exposure to product liability litigation." LAWS OF 1981, ch. 27, § 1. "Product" is defined as "any object possessing intrinsic value, capable of delivery

---

[8]*Kennedy* asserts that the premarket approval process, although it involves specific requirements, must not be confused with the premarket approval requirement itself acting as a specific requirement. *Kennedy*, 67 F.3d at 1459. In *Montoya*, a New Mexico Court of Appeals decision, the court notes that the information made available during the PMA is provided *by the manufacturer*, which can simply neglect to provide adverse test reports. The FDA does not independently test each device. *Montoya*, 919 P.2d at 417. *Montoya* quotes *Kennedy* with approval: " 'Premarket approval is supposed to benefit consumers, not create a rose garden, free from liability, for manufacturers.' " *Montoya*, 919 P.2d at 417 (quoting *Kennedy*, 67 F.3d at 1459-60).

either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce." RCW 7.72.010(3). There is no mention of medical devices in the act. Consequently, there seems little doubt the product liability laws of RCW 7.72, including strict liability,[9] are "requirements of general applicability where the purpose of the requirement relates . . . to other products in addition to devices . . . ." 21 C.F.R. § 808.1(d)(1) (1996). Moreover, manufacturers retain the freedom to choose their responses to tort challenges: they can alter the product or they can bear the costs of lawsuits, including settlements. *Montoya*, 919 P.2d at 417. Design changes are not imposed upon them by verdicts that have "the force and effect of law." 21 C.F.R. § 808.1(b) (1996).

In summary, the weight of authority supports the conclusion that the PMA establishes design requirements. We find that Washington's product liability laws and claims based on these laws do not establish additional or different requirements specific to medical devices. Accordingly, Ms. Wutzke's strict liability claims are not preempted by the MDA.

Reversed and remanded for trial.

THOMPSON and BROWN, JJ., concur.

Review denied at 134 Wn.2d 1003 (1998).

---

[9]RCW 7.72.030; *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 761, 818 P.2d 1337 (1991) (a strict liability standard will be applied to design defect cases under RCW 7.72.030(1)(a)).